[Civ. No. 3474. Second Appellate District, Division One.—May 19, 1921.]

## C. E. MILLER, Respondent, v. LERDO LAND COMPANY (a Corporation), Appellant.

[1] CONTRACT—AGENCY FOR SALE OF LANDS—DEVELOPMENT AND DISTRIBUTION OF WATER FOR IRRIGATION—DUTY OF OWNER—SUPPLY IN ADVANCE OF SALES.—In this action to recover damages for the breach of an agency contract to sell lands, the contract contemplated that the owner should bore wells and construct ditches for the purpose of irrigation as rapidly as was reasonably possible and before the lands were sold.

[2] ID.—ACTION FOR DAMAGES—CONSTRUCTION OF PLEADING.—In this action, the so-called separate causes of action, other than that calling for damages for breach of the entire contract, were in the nature of special damages for particular consequences, substantially growing out of the same breach of contract.

[3] ID.—COMPENSATION OF AGENT—INTEREST ON DEFERRED PAYMENTS—RIGHT OF PARTICIPATION.—Under the contract involved in this action, the language used is sufficient to imply that the agent should share in the interest received on deferred payments on account of lands sold as well as in the principal thereof.

[4] ID.—SUPPLYING OF LANDS WITH WATER—EXTENT OF DUTY.—Under the terms of the contract in question, the owner was required to construct ditches capable of carrying to the several tracts the amount of water necessary for irrigation, and such obligation was to continue until transferred to mutual water companies to be incorporated, which companies were never organized.

[5] ID.—DEFAULT OF OWNER—SUFFICIENCY OF EVIDENCE.—The evidence supports the finding in this action that the owner failed to furnish water for irrigation of the lands in accordance with the contract.

[6] ID.—RIGHT OF WITHDRAWAL OF LANDS FROM SALE.—Under the contract involved, the owner was not given the right to withdraw any land from the terms of the contract upon its determination that water could not be conducted from the wells to the land, or any part thereof, in adequate quantities and at reasonable cost. (Questioned by supreme court on denial of hearing.)

[7] BROKER'S COMMISSIONS—WHEN EARNED.—Unless there is a provision in the contract to the contrary, a real estate agent employed to negotiate a sale of land earns his commission and it is payable when he produces within the time allowed a purchaser who is ready, willing, and able to take the property on the terms prescribed or with whom he enters into a contract upon such or other terms satisfactory to him, and the agent cannot be deprived

of the agreed compensation because deferred payments are not made by the purchaser, or because other terms of the contract are not carried out.

[8] ID.—CONDITIONS OF PAYMENT.—The parties to an agency contract may make the payment of commission dependent upon any lawful condition, as upon a completed sale or out of installments, as paid by the buyer.

[9] ID.—DEFAULT OF VENDOR—COMMISSIONS OUT OF DEFERRED PAYMENTS—RIGHT OF BROKER.—When the vendor does not comply with the terms of his contract and as a result thereof the purchaser fails to complete his payments, the agent is nevertheless entitled to his commissions which were to be paid out of the deferred purchase money.

[10] ID.—EFFECT OF BREACH—PREVENTION OF SALE OF ENTIRE TRACT —SUFFICIENCY OF EVIDENCE.—In this action, the evidence is sufficient to support the finding that plaintiff would have sold all of the land but for defendant's breach of the agreement.

[11] ID.—DAMAGES—PROSPECTIVE PROFITS.—A broker who agreed to conduct a campaign for and the business of selling a tract of land in parcels to the end that the same should be sold in the shortest possible time and agreed not to engage in the sale of other land subdivisions during the life of the agreement is entitled to recover, upon breach of the agreement by the owner, prospective profits.

[12] ID.—EVIDENCE—SALES OF OTHER LANDS IN VICINITY.—In an action by a broker to recover damages for breach of a contract authorizing him to sell a tract of land in subdivisions, evidence of sales made of lands in other places in the vicinity at the period of time in question should have been rejected, where offered to show that plaintiff would have sold the entire tract but for the breach of the contract by the owner.

[13] ID.—EFFECT OF BREACH OF CONTRACT—OPINION EVIDENCE.—Opinion evidence as to the value of the exclusive agency contract, and the profits which might have been made, or the amount of business which might have been done under the agency if it had not been wrongfully terminated, is not admissible, since such opinion would be purely speculative and conjectural.

[14] ID.—QUANTITIES OF LAND SOLD—COMPETENT EVIDENCE.—In such action, evidence showing the quantities of land sold by plaintiff

7. When broker is entitled to commissions, notes, 28 Am. St. Rep. 546; 13? Am. St. Rep. 225; Ann. Cas. 1914D, 395.

9. Right of broker to compensation when sale is defeated by owner, notes, 2 Ann. Cas. 184; 20 Ann. Cas. 1024.

11. Recovery by broker of prospective profits upon breach of contract to sell on commission, notes, 6 Ann. Cas. 976; 10 Ann. Cas. 654; Ann. Cas. 1917B, 1194.

and the rate at which sales were progressing when further performance of the contract was prevented by defendant was properly received, since it tended to prove that further sales could have been made but for the acts of the defendant.

APPEAL from a judgment of the Superior Court of Los Angeles County. G. W. Nicol, Judge Presiding. Reversed.

The facts are stated in the opinion of the court.

Thomas C. Job, Meserve & Meserve and Earl T. Miller for Appellant.

Valentine & Newby and Nathan Newby for Respondent.

CONREY, P. J.—This is an action to recover damages for the breach of a contract in writing dated October 2, 1912, wherein appellant, as party of the first part, gave and granted to respondent, as party of the second part, the exclusive right, subject to the conditions and limitations therein stated, to sell and dispose of, as agent for the first party, the lands known as the "Lerdo Tract," situated in the county of Kern, state of California, and said to contain 6,481.03 acres of land. Judgment having been entered in favor of the plaintiff, the defendant appeals therefrom.

The lands of the Lerdo tract were so situated and of such character that without irrigation they were valueless for agricultural purposes. The parties to the contract believed, and they framed their contract upon that theory, that a supply of water could be developed on the land sufficient to furnish and supply 50 miner's inches for each 160 acres thereof, and that this would be sufficient for the purposes intended. Generally speaking, respondent agreed to sell the land for appellant, and appellant agreed to make the subdivision and provide the water supply. The controversy between the parties herein, as to the actual facts, rests chiefly upon respondent's claim that appellant agreed both to develop and to distribute a stipulated amount of water to each 20-acre tract, and that appellant failed to comply with this agreement and also repudiated the contract, and caused it to be understood in the vicinity where

the land was located that no further development would be made, and that the selling campaign of respondent under his contract had been terminated, and that no further sales would be made, and thereby made it impossible for respondent to complete the sale of the land described in his contract; that otherwise, respondent could and would have sold all of the land within the stipulated time.

There are two counts in the complaint. The first count contains demands for special damages and a demand for general damages. By the second count, respondent sought to recover the proportion which he claims became due to him out of moneys received by appellant, on deferred payments made to appellant by purchasers and for which appellant has not accounted to respondent. The judgment entered in favor of respondent awarded general damages in the sum of $107,928.93, and special damages in the aggregate sum of $53,479.10, under the first cause of action; and $1,890.87 under the second cause of action; making a total of $163,298.90, besides costs.

Appellant contends that the court erred. in overruling its demurrer to the complaint. The grounds of demurrer were that the complaint did not, nor did either count thereof, state a cause of action against the defendant; that in the first count several causes of action were joined but not separately stated; that upon the second count several causes of action were joined but not separately stated; that each count was uncertain in stated particulars, and that each count, for like reasons, was ambiguous and was unintelligible.

[1] In the argument upon the general demurrer to the first cause of action, counsel for appellant depended principally upon certain interpretations which they say should be given to the contract. These points are (a) that under the terms of the contract, appellant's obligations to respondent were to bore wells with reasonable diligence, at reasonable cost, and when a well was bored, that well was to be tested, accepted in writing by respondent, and the lands to be irrigated therefrom declared, and that then, *and not until then,* was appellant under any obligation to respondent to sign any contracts of sale; (b) that the contract did not obligate appellant to construct any ditches or to deliver any water from the wells to any tract of

land, or to do anything in the way of development of water other than "as needed in order to supply the lands *sold* with water for irrigation"; (c) that under the proposed contracts to purchasers, respondent was to be under no obligation for delivery of water to the purchaser until the time when the conveyance was to be made; (d) that the contract did not contemplate that appellant should be called upon to execute contracts of sale to purchasers until the water for those lands had been provided in the manner stated in the contract. With these suggested views of the meaning of the contract we do not agree. Throughout the contract it appears that the land could not and it was not expected that it would be sold, without actually supplying water to each tract. Manifestly, this was to be done by appellant. Necessarily, this included ditches, or other conduits, adequate to bring the required amount of water to each purchaser's land. It was provided in the contract that this work was to be done "as rapidly as reasonably possible and as needed in order to supply the land sold with water for irrigation." The supply was to be "sufficient to furnish and supply 50 miner's inches'for each 160 acres of said lands." This furnished a basis for computation of the quantity of water to which each tract sold would be entitled. Time, amounting to several years, was to be allowed to the purchasers to complete their payments. Nevertheless, it was provided that the purchaser must agree that during the first and each succeeding year of his contract until at least one-half of the purchase price was paid, he would cultivate and irrigate not less than one-half of the land agreed to be purchased by him. Clearly, he could not comply with such proposed agreement unless the water was brought to his land promptly after the making of such contract. It was further provided in the contract between respondent and appellant that purchasers of land should be "entitled to the use of water thereon from the time of purchasing or agreeing to purchase the same," and should pay assessments for the use of the water. It was further agreed that respondent would "immediately enter upon a campaign for and the business of selling the land and property hereinabove described, to the end that the same shall be sold and disposed of in the shortest possible time and at the best

obtainable price under and in accordance with this agreement."

[2] Replying to the contention that in the first cause of action several causes of action were joined but not separately stated, respondent says that the so-called separate causes of action, other than that calling for damages for breach of the entire contract, were in the nature of special damages for particular consequences, substantially growing out of the same breach of contract. This we believe to be a correct construction of the pleading.

[3] Concerning the questions raised by demurrer to the second count of the complaint, the only one which seems to require special attention relates to respondent's demand for a share of the money received by the Lerdo Land Company as interest on deferred payments made by purchasers of some of these tracts of land. It was provided in the contract that (except as to the town site) the sales prices in the subdivision should be at least $150 per acre; that "the second party is to receive $50 of said purchase price of $150 per acre, in full compensation for all of his commission, labor, services and expenditures made under or in connection with this agreement, and $100 per acre is to belong to and be retained by the first party. If any of said land is sold for a price in excess of $150 per acre, then as to such excess, the same is to be equally divided between the parties of the first and second parts. Where the initial payment does not exceed 25 per cent of the purchase price, all of such amount received shall be retained by the second party, and as to all amounts received for initial payments in excess of 25 per cent, or payments thereafter received, such amounts shall be divided between the first and second parties *pro rata,* in proportion to their interests as herein agreed, until said second party is fully paid. The party of the second part is to receive such payments of commissions at the date of the execution and delivery of such contract of purchase, and at the date of the making of the initial payment, and the several succeeding payments as provided to be made in said contract of purchase, until such time as the party of the second part has received all amounts due under this agreement." According to the terms of the contract, it seems to have been intended that respond-

ent should have a direct interest in those sums collected
by appellant as part of the purchase price of the land
sold and that such direct interest should be measured in
the proportion stated in the contract. We think that the
language used is sufficient to imply that respondent should
share in the interest received on such deferred payments
as well as in the principal thereof.

Very soon after the contract of October 2, 1912, was made,
the Lerdo tract was subdivided and maps of the subdivisions
were recorded. In addition to the principal subdivision,
the contract included two smaller areas which were desig-
nated subdivision "B" and subdivision "C." The trans-
actions which touch the merits of the action were those
having relation to subdivision "A." Certain wells were
on the land at the time when the contract was made. The
work of putting these wells into good condition was com-
menced by appellant, who also entered upon the work of
drilling other wells. Appellant employed engineers under
whose supervision ditch lines were laid out and ditches
were prepared to carry the water from some of these wells
both to tracts which were sold by respondent and to other
tracts the sale of which was intended. In pursuance of
the terms of his agreement, respondent promptly entered
upon its performance, inaugurated a vigorous selling cam-
paign, and to that end employed a number of subagents;
printed and circulated literature concerning the land, and
advertised it extensively, and devoted his own time ex-
clusively to the sale of the Lerdo tract in good faith and
as required by the terms of the contract. In connection
with these activities, respondent expended large sums of
money which were necessary and proper in the fulfillment
of his obligation to appellant. The court found that re-
spondent duly performed the obligations imposed upon him
by the contract until prevented from the performance
thereof by appellant, and that from and including Decem-
ber, 1912, to and including April, 1913, plaintiff sold to
*bona fide* purchasers 1,198.91 acres of the said Lerdo lands .
Many of the purchasers entered into possession of the
land covered by their contracts and attempted to raise
crops thereon. In the spring of the year 1913, and especi-
ally during the month of May, the crops planted on some
of these lands were seriously injured for want of irriga-

tion. This caused dissatisfaction among the purchasers and interfered with the success of the enterprise in the matter of selling more land. The court further found that appellant neglected and refused to develop and distribute water to the land in the Lerdo tract as it had covenanted and agreed to do. The findings contain a statement outlining the particulars in which it was determined by the court that there was a failure to supply and distribute water in the manner and in the quantities provided for in the contract of respondent and appellant, and that this failure was due to the fault of appellant. It is one of the principal contentions of appellant that there is no evidence to sustain the findings in this matter of alleged failure in the development and distribution of water. The evidence on this subject is reviewed extensively in appellant's brief. It occupies many hundreds of pages of the printed record. Under the well-understood rule that the findings will be sustained if there is in the record evidence substantially tending to support the same, even though there may be strong conflicting evidence, it has been our duty to examine this record, not for the purpose of weighing the probabilities, but for the sole purpose of determining whether there is evidence which taken alone is sufficient to prove the facts found. In the summary contained at the end of their review of the evidence, counsel for appellant state their position to be: A. That the evidence shows that wells were drilled and equipped as rapidly as reasonably possible and that more water was developed than required at all times. B. That the evidence shows that ditches were constructed carrying water to all of the lands sold as rapidly as reasonably possible; and that all of the purchasers received the contract amount of water except those in that district where the land was withdrawn because of the impossibility of developing water at reasonable expense. As to certain purchasers who testified that they did not receive sufficient water—that their lands were not properly leveled, so that although the contract amount was delivered, sufficient water to make a crop was not, which resulted in the loss of crops in 1913, and this further resulted in the extension of time of payments required from purchasers, and the extension of Miller's contract. C. That if the ditch sys-

tem was not sufficient, this insufficiency grew out of something over which appellant had no control, to wit: (a) Ditches were constructed out of fresh, loose earth. (b) Character of the soil was such as to make it impossible to construct sufficient ditches. (c) This fact was admitted by respondent by the request which he made for a cement pipe system, and certain land was actually withdrawn to sell to obtain the money with which to put in such a system.

Subdivision "A" extends in a northwesterly direction for a distance of several miles. The Southern Pacific Railroad runs in the same direction through the subdivision, so that about one-fourth thereof is on the northerly side of the railroad. The town site of Lerdo was laid out in section 15, one of the north line of sections of subdivision "A." On October 2, 1912, there were eight wells on this subdivision, which are known in the record as wells 1 to 8, inclusive. The wells drilled by appellant subsequent to the date of this contract were numbered 9 to 15. Most of the land sold and for which irrigation was required in the spring of 1913 were in the central part and northerly half of the subdivision. In May, 1913, well No. 9 had been finished and equipped, and was producing 972 gallons per minute, which, according to appellant's estimate of 9 gallons per minute as representing one miner's inch of water, amounting to 108 inches. No. 10, when first put on the pump on April 19th, had "sanded up." According to some of the testimony, this had been unnecessarily permitted by neglect on the part of appellant. On May 16th pumping was resumed and the well was then producing about 120 miner's inches of water. Of the old wells, the only substantial results then being obtained were through wells 2, 5, and 7, with a combined product of 3,900 gallons per minute, or about 433 miner's inches. These constituted the supply available at the wells to meet the demands for water to be used upon the lands sold by respondent. If this quantity of water, without excessive loss, had been delivered on those lands, it is improbable that there would have been any complaint of want of water for irrigation. Apparently the trouble consisted in the lack of sufficient means of distribution rather than in failure to develop an adequate amount of water for the then ex-

isting emergencies. The testimony shows that ditches were supplied from wells 9 and 10 leading to some of these sold lands. These ditches, however, were so constructed and in such condition that there was an excessive waste of water and that the water would often break through and run over land where it was not wanted. It had not been intended to supply water to the northerly part of the subdivision from wells 2, 5, and 7, but there was an old ditch extending from those wells toward this northerly area, and an attempt was made to restore this ditch so as to carry more water to the area which was supposed to be under wells 9 and 10 and under other wells which were to be completed in that neighborhood. The last-mentioned ditch was likewise unfit to produce the desired result. In consequence of these conditions, the hemp, ramie, and grain of the purchasers who had attempted to raise those crops was burned up in the hot days of May and June, 1913. Appellant testified that in the early part of May, together with Mr. Wishon, the general manager of appellant company, and Mr. Balch, its president, he made a thorough survey and inspection of subdivision "A" to ascertain what would be the best method to settle with the purchasers who had been damaged on account of the water failure, and to ascertain what would be the best method of putting the Lerdo water in proper condition for future supply. According to this testimony, after a very full examination and discussion of the situation, Mr. Balch stated that he realized that they had not done on the subdivision the things which they ought to have done, and asked respondent to arrange for settlements with the purchasers. He said he would give them an extension of time, knock off their interest and water charges, and postpone their payments; "just tell them we are going to put concrete pipes on this land and put it in proper shape so the future will have nothing but success for these people." No cement ditches ever were constructed, and it is not claimed that the contract obligated appellant specifically to construct such ditches. If there was any such obligation, it could only be incidental to appellant's obligation to provide by some means a sufficient distribution of the agreed quantity of water for the tracts which it was proposed to sell. [4] It was provided in the contract that

"after the drilling, and installation of the wells, and the construction of the ditches herein called for, and as herein agreed, and capable of producing the quantity of water required, the party of the first part shall be under no further liability or expense in connection with such wells or water system or the pumping or delivery of such water." This amounts to a direct agreement that the appellant would construct ditches capable of carrying to the several tracts of land the amount of water necessary for irrigation, not exceeding the defined quantity, as measured by the limit of 50 miner's inches for each 160 acres. The water was to be carried "to each twenty-acre lot of said land." It was further provided in the contract that appellant would cause mutual water companies to be incorporated for the purposes of ownership and distribution of the water supply among the owners of the lands purchased from appellant, and would convey to the purchasers "said land when paid for, together with said water or shares of stock in the water company holding same, sufficient to give each buyer of land the supply of water above provided." The effect of the contract was that appellant's obligations concerning the development and distribution of water as defined in the contract were to continue until transferred to the mutual water companies. No such companies ever were organized.

The contract of October 2, 1912, provided for its continuance and termination as follows: "If, within one year from the date hereof, the second party shall have sold 1,500 acres or over, or obtained agreements for the sale of same in accordance with the terms hereof, this agreement shall continue for two years from the date hereof; and if within two years from the date hereof the second party shall have sold or obtained agreements for the sale of 4,000 acres of said lands, in accordance with the terms hereof, then this agreement shall be extended and be in force for one year longer, during which third year the party of second part shall have the privilege of selling and disposing of all of the remainder of said lands upon the terms herein set forth. In the event sales are retarded or interfered with by failure of water developments, as herein agreed upon, then, if for that reason the sales made do not equal the acreage herein required, within the periods above specified, the time within which such acreage is to be sold shall be extended for a

period equal to the time lost by reason of such failure of water developments.'' It was also provided ''that if it shall be ascertained and determined by the first party in the drilling of wells upon any portion of said lands that water cannot be discovered, produced, and developed for the irrigation of the same in adequate quantities, and at reasonable cost, then and in that event, the first party shall in writing notify the party of the second part to that effect, and shall describe the lands upon which it has been ascertained and determined that it is not practicable to develop and deliver water in adequate quantities and at such reasonable cost, and such lands, so described in such notice shall thereupon be removed from the terms of this agreement, and shall cease to be affected hereby or included herein.''

[5] Without attempting to more minutely set forth the evidence tending to prove failure of appellant to perform the obligation which it had assumed with relation to the development and distribution of water in the early part of the year 1913, we state it as our conclusion that the evidence supports the finding that such failure did occur. That this condition, which continued to exist throughout the year 1913, was recognized by the officers of appellant is indicated by a letter dated November 24, 1913, addressed to respondent, in the name of appellant, by its president and secretary, purporting to extend respondent's time for making sales. The letter said: ''This is to advise you that in view of the fact that Lerdo land sales have been interfered with on account of water conditions and will necessarily be slow on that account in future, we hereby cancel your obligation to have sold 4,000 acres by October 2, 1914, and hereby extend the time in which you shall have sold that many acres to October 2, 1915, and you shall have until October 2, 1916, to sell out the entire Lerdo acreage.''

During the year 1913, and while the unsatisfactory conditions above mentioned existed with respect to water supply for sundry purchasers of land in the Lerdo tract, respondent co-operated with appellant in the efforts which they made to prevent those purchasers from abandoning their contracts, by granting to them concessions with respect to their interest and water charges, and by extending their time for making payments.

On the eighteenth day of March, 1914, appellant served upon respondent a notice that it thereby withdrew and removed from the terms of the contract certain described land, which embraced all of subdivision "A" lying north and east of the railroad. This was done upon the stated ground that the withdrawal was made under the provisions of the contract and because of the fact "that it has been ascertained and determined by the said Lerdo Land Company in the drilling of wells upon said lands, and also in the attempt to discover, produce, and develop water for the irrigation of the same, that water cannot be discovered, produced and developed for the irrigation of said lands in adequate quantities and at a reasonable cost." Respondent was thereby notified not to make any sales whatsoever of said withdrawn lands or any portion thereof. On the same day, March 18, 1914, appellant caused to be served upon respondent a notice that the Lerdo Land Company had refused to approve the above-mentioned letter of November 24, 1913, and "you are further notified that no extension of time within which you may sell any of the land belonging to the Lerdo Land Company, under the provisions of the contract between it and you dated October 2, 1912, had been granted and said letter is of no force or effect, and is not the act of, and is not approved by, said Lerdo Land Company."

In finding XXIV, after setting out the notice of withdrawal of lands dated March 18, 1914, the court found that in fact it was practicable to develop and deliver water in adequate quantities and at reasonable cost upon all of the lands described in said notice, and it had not been ascertained, in the drilling of wells upon any portion of said lands described in said notice, that water could not have been, and could not be, discovered, produced, and developed for the irrigation of said land in adequate quantities and at reasonable cost. "That at the date of said notice, water had already been developed in that portion of subdivision 'A' lying north and east of the right of way of the Southern Pacific Railroad Company at a reasonable cost, and in such quantities as to demonstrate that an adequate supply could have been secured if defendant had diligently prosecuted its development work, and the work of distributing the water already developed, to the land sold

and that remaining unsold in said subdivision 'A' of said Lerdo Tract.'' After further statement of the acts of appellant in carrying out the policy indicated by these notices, the findings (No. XXV) declare that by its conduct in refusing to develop and distribute water upon said tract of land as required by said sales contract, and by the circulation of the information that plaintiff's selling campaign had been terminated under his contract, and by the repudiation of said extension agreement, and by its refusal to execute any contracts to purchasers of land in the Lerdo tract, produced by plaintiff, after March 18, 1914, appellant rendered it impossible for respondent to complete the sale of the land described in his contract and remaining unsold at the commencement of this action, and ''by such conduct, prevented plaintiff from fully performing the terms of the said sales contract by selling all of the unsold land therein described,'' less a certain 1,390.08 acres which had been withdrawn from sale by mutual consent.

The court made the further finding (XXVI): ''If the selling of said Lerdo tract of land had not been interfered with by the defendant, and complete performance of plaintiff's sales contract had not been prevented, as hereinbefore found, and if said defendant had performed the terms and conditions of its said contract with plaintiff (Exhibit 1) for the development and distribution of water, the plaintiff would have been able to and would have sold the remainder of said tract of land, upon the terms and conditions mentioned in said sales contract, within the time prescribed in said contract and the extension thereof dated November 24, 1913, and by such performance he would have earned in excess of all expenses in making said sales the sum of $107,928.93, including the town site, and excluding the 1,390.8 acres withdrawn by mutual consent, and described in Exhibit 3 attached to the complaint. That plaintiff was thereby damaged by the defendant in the sum of $107,928.93, no part of which has been paid. And the court finds that fifteen (15%) per cent, of the gross selling price of said land would have been the reasonable cost and expense to plaintiff of selling said unsold land.''

[6] The right of appellant to withdraw from the terms of the contract any land of the Lerdo tract, as such right was defined in the contract, was limited to one condition

alone, which was that appellant must have ascertained and determined in the drilling of wells that water could not be discovered, produced, and developed on said land for their irrigation in adequate quantities and at reasonable cost. It was not provided that excessive cost of distribution of water produced and developed on any such land would alone authorize appellant to remove that land from the terms of the agreement. The purpose of the parties in making this reservation in the manner stated is plain when its subject matter is considered. Whether wells thereafter to be driven would produce adequate quantities of water, or any water at all, or whether the cost of drilling wells would be excessive, was necessarily uncertain. On the other hand, the cost of labor and materials required for the construction of a distributing system was capable of ascertainment to a reasonable extent, and presumably was taken into consideration by appellant before deciding to go ahead with the enterprise and before entering into any contract with respondent. The evidence is sufficient to sustain the findings of fact stated in finding XXIV as hereinabove set forth. We are satisfied that by the conduct of appellant in endeavoring to withdraw the described land from the operation of the contract, and by its further conduct in refusing to proceed further under the contract, appellant was guilty of acts constituting breaches of its contract with respondent. The legal consequences of these acts will be discussed when we come to a review of the award of general damages and the exceptions thereto.

*First two groups of special damages claimed.* The first item of special damages allowed ($27,040.59) represents the unpaid commissions claimed to be due to respondent on certain sales made of parcels of land in the Lerdo tract, concerning which the court found "that solely because of the failure of defendant to perform its said contract with plaintiff and with each of the said purchasers, the contracts with the persons hereinafter named were canceled by the mutual consent of defendant and said purchasers, prior to the commencement of this action, but without the consent of plaintiff, and each of said purchasers was released by defendant from all further obligations of his said contract with defendant of every kind and description whatsoever." The second item ($8,251.01) is identical with the first, except

that the cancellations occurred after the commencement of this action.

[7] It is the general rule that unless there is a provision in the contract to the contrary, a real estate agent employed to negotiate a sale of land earns his commission and it is payable when he produces within the time allowed a purchaser who is ready, willing, and able to take the property on the terms prescribed or with whom the owner enters into a contract upon these or other terms satisfactory to him; and the agent cannot be deprived of the agreed compensation because deferred payments are not made by the purchaser, or because other terms of the contract are not carried out. (*Stewart* v. *Bowie*, 43 Cal. App. 751, [185 Pac. 868].) [8] But the parties to an agency contract may make the payment of commission dependent upon any lawful condition. The contract may be so worded as to make it clear that the parties intended that the commissions, or some part thereof, were not to be paid except upon a completed sale, or (as in the case at bar) out of installments of the purchase money as the same shall be paid by the buyer. (*Shepherd-Teague Co.* v. *Hermann*, 12 Cal. App. 394, [107 Pac. 622].) It therefore follows that to establish the liability of appellant for the payment of commissions to respondent (other than those paid at the time of making the initial payment), for any sale made by respondent, he must establish that the purchaser made some payment on the deferred purchase price, or that the purchaser did not make payment because of some fault of appellant. In other words, the right of respondent to recover the special damages claimed for nonpayment of commissions on the sales actually made cannot be sustained if the evidence is insufficient to prove that such nonpayment of installments by the purchaser resulted from the fault of appellant as set forth in the finding last above quoted. [9] When the vendor does not comply with the terms of his contract and as a result thereof the purchaser fails to complete his payments, the agent is, nevertheless, entitled to commissions which were to be paid out of the deferred purchase money of the land so bought. (*Realty Bonds etc. Co.* v. *Point Richmond etc. Co.*, 171 Cal. 238, [152 Pac. 433].) In *Ratzlaff* v. *Trainor-Desmond Co.*, 41 Cal. App. 586, [183 Pac. 269] (third district court of ap-

peal), it was held that if the contract of sale is canceled by mutual consent of the vendor and vendee, the vendor does thereby, in a legal sense, prevent the payment of the purchase price. It was pointed out that the commission contract necessarily implied that the vendor would act in good faith and do nothing to prevent, or even discourage or embarrass, the completed purchase of the property. It was the duty of the land owner, under his contract with the agent, to do everything possible to promote the fulfillment of the sales contract by the purchaser, "and thereby to aid in securing the purchase price, to the end that respondent might receive compensation for the services which he had performed."

Counsel for appellant contend that the evidence is insufficient to support the finding of the court that each of these purchasers would have complied with his contract if the conditions thereof with reference to the development and distribution of water had been performed; that, on the contrary, the evidence establishes without conflict that they forfeited their respective contracts without right and not by reason of any fault of appellant. Pursuant to this contention, they insist that according to the testimony of some of these purchasers, the reason they forfeited their respective contracts was that they were charged $8 per year for water, whereas, under the representations made to them, they should not have paid more than $4. Their contracts contained no agreement limiting the water rate, and there is no evidence that the charge made was excessive. Following the tabulation set out in the brief for appellant, we have examined this testimony.

The statements of some of these purchasers, but not of all, were clearly to the effect that on account of the high water rate alone they would have refused to make their payments, even if the water supply had been sufficient. By "sufficient" we think that it may fairly be inferred that they intend to refer to the agreed quantity, which was at the rate of 50 inches for each 160 acres of land. But under the contracts they were not entitled to refuse payment for that cause. The court, however, was not compelled to accept such testimony of purchasers as conclusive. Other evidence produced by respondent tends to show that, apart from the rates charged for water, the failure of appellant to

produce and distribute the agreed supply of water for the use of these purchasers had caused them to be dissatisfied, and was sufficient to justify them in refusing to hold to their contracts, and except for the concessions which they obtained as next hereinafter stated, probably would have caused them to refuse payment even if the water rate had not exceeded the expectations which they had derived from the representations made to them.

In the summer of 1913, after the failure to distribute water as provided by the contracts had occurred, and while the complaints on that score were under consideration by the parties, extension agreements were made whereby all of those purchasers, except Irene Darnall and Mrs. M. C. Fritcher, remained in possession of their lands without charge for water, taxes, or interest until the end of the year. It was after these extensions had expired, and after notice and demand, and after failure by those parties to make further payments on the contracts, that their contracts were declared forfeited. Appellant contends, and the evidence appears to support that contention, that none of these cancellations, except under the Darnall and Fritcher contracts, were made by mutual consent of the parties. After the contracts had been declared forfeited for nonperformance, then as to certain matters and as to certain claimed rights of possession, the defendant and some of the contract holders entered into special negotiations which resulted in the adjustment of those matters whereby, as a condition of such settlement, the purchasers surrendered their contracts. These being the facts, appellant contends that the evidence is insufficient to support the finding that these contracts were canceled by mutual consent of the parties because of the failure of the defendant to perform its obligations under those contracts. This contention is correct, to the extent that by accepting the concessions thus granted, the purchasers waived their right to abandon the contracts by reason of the then existing default of appellant in furnishing the water supply, but this waiver was conditioned upon the absence of any further failure of appellant to perform its contract obligations. It is not true, however, as to all of the purchasers, that the water supply continued to be insufficient. For example, J. S. Bird testified that in 1914 he had plenty of water, but for

some reason, not defined, his crop was not satisfactory. There were others who testified that after 1913 they had "plenty of water." With respect to these parties, their waiver of their right to abandon the contracts remained in force, and the subsequent declaration of forfeiture of their contracts was an exercise by appellant of its rights in the premises. None of them thereafter asserted any claim for damages or right of cancellation. It follows that the findings (XVI and XVII), now under consideration, are not sustained as to all of those contracts. They are also excessive, in allowing commissions for the sales to Mr. Weyand and to Mrs. Mitchell. Both of those purchasers gave testimony which, apparently without contradiction, proves that their failure to make their payments was based upon reasons which were outside of their contract rights against appellant. Mrs. Kelsey testified that she purchased the land through respondent, who promised to lease it for her. When she found that she could not lease the land, she did not choose to invest any further money in it. This appears to be the only reason why she did not go on with the contract.

Appellant calls attention to a special list of commissions allowed, amounting to $13,507.30 (being a part of the above-mentioned sums of $27,040.59 and $8251.01), concerning which counsel for appellant say that there is no testimony from the purchasers, or any other person, giving any reason why they failed to make their deferred payments. Respondent has not contradicted this statement. The index of the transcript shows only three persons, out of the 23 contracts covered by this list, who were witnesses at the trial. These were Cloud, Meudell, and J. P. Seaton. Seaton is the only one whose testimony indicates that his failure to pay resulted from failure to get sufficient water to irrigate his land. In all these instances, where there is no evidence tending to prove the reason for failure of the purchaser to make his deferred payments, the court was not justified by the evidence in finding that the contracts were canceled by mutual consent of appellant and the purchasers, or because of appellant's failure to perform its contract. Each one of the canceled contracts, about 58 in number, constitutes a separate item in the claim for commissions earned, and must be supported by evidence sufficient to en-

title plaintiff to compensation under the rules hereinabove stated. When so examined, many items of the awards of $27,040.59 and $8,251.01 are not sustained by the evidence.

*Third group of special damage claims.* Finding VIII reads as follows: "Plaintiff sold to J. C. Apple, Alfred Curtis, W. E. James, and W. R. Godfrey, seventy acres of said land at the contract price of One Hundred Fifty ($150.00) Dollars per acre, and the defendant executed to each of said purchasers a contract for the land for which he had made a written application, but each of said purchasers refused to accept the formal written contracts executed by defendant, and tendered to said purchasers for execution, solely because of defendant's failure and refusal to develop and distribute water necessary for the irrigation of said Lerdo Tract and of said land so purchased, as it was required to do by the terms of its said contract with plaintiff. And if defendant had performed its said contract for the development and distribution of said water so that said land and other land in the Lerdo Tract could have been irrigated, the said last named purchasers would have executed said contracts tendered to them, and they were and each of them was ready, able and willing to have paid for said land in accordance with the terms of said contracts so tendered to them, if the water had been developed and distributed by defendant as required by the terms of said contract with plaintiff. That commissions earned by plaintiff by the sale of the last named seventy (70) acres of land amounted to the sum of $3,500.00, no part of which sum has been paid to him or to any one for him." It is conceded to be the law that in construing such a contract as that of October 2, 1912, in order for an agent to earn his commission where the sale was not consummated, it is necessary to prove that he found a purchaser ready, willing, and able to buy the property on the terms fixed, and either that he procured from that person a valid contract binding him to purchase the property upon those terms, or that he brought the vendor and the proposed purchaser together so that the vendor might have secured such contract if he desired.

Appellant contends that the evidence is insufficient to support the finding, especially in this, that the evidence is insufficient to prove that said four persons, or either of

them, was ready, willing, and able to buy the property pro-·
posed to be sold to them. In 1913, Curtis visited the Lerdo
tract with one of respondent's agents and made a deposit on
two 10-acre lots. A few days later he visited the land
again and observed that there were no ditches near com-
pletion near those lots. Being asked what caused him to
refuse to go on with the purchase of that land, he said:
"Well, I could not see where to make myself—that they
were going to get the water there; and, another thing, I
could not see, to my estimate, that their price was to hold,
anything to guarantee that the price was to hold the same
price for water; that they could raise the price of the water
any time they saw fit, that was my idea. . . . At the time
I made the deposit on 23 and 24 I was ready, able, and
willing to complete the purchase."

Apple visited the Lerdo tract and made a deposit of
$100 on account of two lots. Subsequently he visited the
land again. Seeing "that other people out there had not
got their water, and so on and so forth," he declined
to complete his first payment or to accept a contract. "The
fellow that sold me the land, he told me I was to get
water from the well right adjoining the 20 acres, and then
afterward I heard that I was to get water from the other
two wells a mile and a half below there, something like
that. . . . I told him that I would get the water right there
adjoining the land I had picked out, and I come to find
out that I had to get it from way down below, and I seen
the other crops out there wasn't doing well, and everybody
else wasn't getting water, and I decided to let mine go."

James did not testify. According to a letter of January
20, 1914, from appellant's secretary to respondent, and
respondent's reply thereto, it appears that some kind of pre-
liminary agreement to purchase had been made with James
in March, 1913. Miller's letter states that he instructed his
agent at Bakersfield to have the James contract "returned
immediately to this office or to have the same executed and
the first payment made. . . . Our agent at Bakersfield ad-
vises that Mr. James has been away from Bakersfield, has
never occupied the land and did not receive any rent from
same."

Godfrey did not testify. The only evidence concerning
him was that of respondent's witness Stancliff, who stated,

"I showed some land in the Lerdo subdivision to a man by the name of Godfrey, W. R. Godfrey. I don't think he became a purchaser of any of the land of the Lerdo subdivision. The reason why he didn't become a purchaser was that he didn't like the contract. There was a discussion as to the water. The lack of proper distribution of the water wasn't the reason so much as the price of it—the price and interest and everything would eat it up. He was just a wage worker. He didn't have any capital and that's the reason he didn't buy."

It is not claimed that there was any evidence concerning these four sales different from that to which we have referred. Full commissions, amounting in all to $3,500, were allowed for these so-called sales. As to each of them, the evidence is insufficient to sustain the finding that he refused to execute the proposed contract with him "solely because of defendant's failure and refusal to develop and distribute water necessary for the irrigation of . . . said land so purchased." Curtis would not take the contract without a guaranteed limit on the price of water. The evidence does not show why James did not sign the contract, and it affirmatively shows that Godfrey was neither willing nor able to buy. The only one of these four purported sales on which the evidence creates a shadow of right of the plaintiff to commissions is that relating to the sale to J. C. Apple.

*Fourth group of special damage claims.* On these claims commissions were allowed in the total sum of $14,687.50, being for sales to Burke, Killian, Paul, and Reiss. The court found that between April 10, 1914, and August 1, 1914, respondent procured *bona fide* offers from the persons named for the purchase of certain lots in the Lerdo tract; that each of said persons was ready, able, and willing to buy said land and to execute a written contract for the purchase of the land selected, and was ready, willing, and able to pay for the land at certain prices and on certain terms, which were in conformity with the agreement between appellant and respondent concerning such contracts; that plaintiff requested the defendant to execute a contract to each of said persons for said lands, and the defendant failed and refused to execute and deliver any contract to either of them; that if said contracts had been executed

and delivered by defendant when requested or within any reasonable time, the said persons would have executed said contracts and would have paid the purchase price in accordance with the terms and conditions thereof.

In harmony with the disposition hereinbefore. made of the questions relating to the interpretation of the contract of October 2, 1912, and the obligations of appellant thereunder, we hold that respondent was entitled to make these alleged sales. At this point it is only necessary to consider the contention of appellant which attacks the good faith of these alleged sales. Respondent testified that on April 10, 1914, he made the sale of certain described lots to James A. Burke, and sent to appellant a written application requesting that contract for that land be executed to Mr. Burke. The application described the lots, the price, the installment amounts; showed that no deposit had been made, and was unsigned. Similar transactions occurred respecting the sales to Killian, Paul, and Alma C. Reiss. None of these contracts ever was executed by appellant.

Killian, Burke, and Paul testified that they were ready, able, and willing to make their first payments, and would have done so if the contracts had been executed. S. N. Reiss, husband of Alma C. Reiss, conducted the negotiations for the Reiss contract, but directed that it be made in her name. He testified that he was making the purchase for his wife, and that he was ready, able, and willing to purchase the land and pay for it according to the terms indicated by the receipt. At about the end of July, 1914, which was after appellant had refused to execute contracts for these sales, these parties, at the request of respondent, signed the agent's receipt. In making this request by letter to Burke, respondent in that letter said: "I wish you would sign the inclosed agent's receipt and return to me at the place provided for purchaser to sign, as an evidence that you were willing prior to April 20, 1914, to enter into an agreement to buy this land. By signing this agreement, you do not obligate yourself to purchase the land at all now, unless you see fit, as the agreement specifically provides that the Lerdo Land Company should have entered into an agreement with you ten days subsequent to April 10, 1914, which they refused to do." While the act of respondent in asking for a

signature to such a document three or four months after its
date, and the fact that these receipts were made up and
sent to appellant with a request that appellant execute con-
tracts when in fact the proposed purchaser had not made
the usual deposit and had not signed any preliminary
memorandum of sale, were circumstances to be considered by
the court in determining whether or not the offers were
made in good faith, they were not conclusive as against
the other evidence tending to support the finding as made
by the court.

[10] *General damages.* Besides the special damages
awarded, we have seen that respondent was allowed dam-
ages in a sum specified as the net amount of compensation
which he would have earned upon sale of all that part of
the Lerdo tract which remained unsold at the time when per-
formance of the contract by respondent was prevented by
appellant. Appellant contends that such damages are specu-
lative and uncertain in their nature and are incapable of
proof; that, in fact, the evidence offered to prove that the
plaintiff would have been able to sell, and would have sold,
all of the lands of the Lerdo tract upon the prescribed
terms and within the time agreed upon between appellant
and respondent, if such performance by respondent had not
been prevented by appellant, is insufficient to establish
those facts; and that the court erred in overruling appel-
lant's objections to the evidence.

For the purpose of showing that he could have sold all
of the land in question, respondent introduced testimony
showing that large amounts of land had been sold in other
subdivisions made in other localities of the San Joaquin
Valley, and tending to prove that the Lerdo land was more
desirable for selling purposes than were these other tracts.
Basing their statements upon acquaintance with the real
estate market in the vicinity where some of these other lands
had been sold, witnesses testified favorably to respondent's
contention that he could have sold the land; such testimony
being, in part, as follows: The witness Baldeschwieler tes-
tified that, "We could have sold a good deal of that land";
giving as the reason for this opinion, that "there was a
good deal of land sold up in that part of the country."
Alexander, another subagent who had made some sales there,
said that the failure of crops there in 1913, "caused by

no water," had prevented him from selling about 80 acres
to persons who stated that they would not buy "because
there wasn't sufficient water." Also, that if there had been
no water failure, he "might have probably sold 1,000 acres
or probably better." Respondent testified that the entire
745 lots in the town site of the town of Lerdo could have
been sold at $150 per lot, which he said was their average
value. We have taken these facts from the review of the
evidence as contained in the brief for appellant. The evi-
dence thus brought to view shows that the tract was favor-
ably situated for selling purposes; that the land was shown
to various prospective purchasers who did not buy; that
some of these witnesses gave it as their opinion that they
would have been able to sell some of the Lerdo land. There
was also evidence indicating a serious decline in the condi-
tion of the real estate market from the year 1913 until and
including the year 1915. Counsel for respondent, on the
other hand, contend that the evidence is sufficient to support
the finding in question, since the following additional pro-
bative facts exist: Between December 1, 1912, and May 1,
1913, respondent sold to *bona fide* purchasers Lerdo lands
aggregating 1,198.91 acres, for which contracts were exe-
cuted; that other sales were negotiated but failed of com-
pletion because of the failure of appellant to install an
irrigation system such as the contract required; that re-
spondent made additional sales to *bona fide* purchasers be-
tween May 1, 1913, and March 17, 1914; that he had made
sales amounting to a grand total of 1,881.71 acres before
his sales contract was repudiated by appellant; that "this
concrete fact of actual accomplishment, under the most
unfavorable conditions, is the most potent evidence of the
very reasonable probability that all the balance of the
land could have been sold within the extended period agreed
upon in the letter of November 24, 1913, if appellant had
complied with its contract and its promises instead of
repudiating its obligations as it did do in March, 1914."

Section 3300 of the Civil Code states the rule of damages
for breach of contract as follows: "For the breach of an
obligation arising from contract, the measure of damages,
except where otherwise expressly provided by this code, is the
amount which will compensate the party aggrieved for all
the detriment proximately caused thereby, or which, in the

ordinary course of things, would be likely to result there-
from.'' In connection with appellant's contention that the
evidence is insufficient to support the finding that all of the
land would have been sold, counsel for appellant depend
upon the rule (which has been applied under defined con-
ditions which appellant claims are illustrative of the con-
ditions proved here), that prospective profits are too specu-
lative and remote to justify an award of damages; in other
words, that their nature is such that it is incapable of being
proved that in the ordinary course of things such damages
would be likely to result from the breach of the contract.
The contention is not that lost profits may not be included
as a proper element of damages. But, admitting that such
profits are a proper subject of recovery if capable of being
ascertained, the contention is that, as applied to a contract
like that here under consideration, the claimed profits are
too speculative and remote to be capable of anything like
reasonable ascertainment.

The subject of damages by reason of loss of prospective
profits, and evidence admissible to prove such losses, was
considered and discussed by the supreme court of Cali-
fornia in *Pacific Steam Whaling Co.* v. *Alaska Packers'
Assn.*, 138 Cal. 632, [72 Pac. 161]. During the fishing
season of 1897, the defendant unlawfully and forcibly ex-
cluded plaintiff from fishing in the ocean along certain por-
tions of the shore of Alaska. Overruling objections of the
defendant, plaintiff was permitted to introduce evidence
tending to show how many fish the plaintiff could, with rea-
sonable probability, have taken from the fishing grounds in
question if it had not been excluded therefrom by the un-
lawful acts of defendant—the value of such fish, and the
profits which would reasonably have accrued to plaintiff
from the fish when canned. Plaintiff was also, in this con-
nection, allowed to introduce evidence tending to show how
many fish defendant actually did take in those fisheries dur-
ing said season. The court instructed the jury that if it
found that plaintiff suffered damage by reason of the
alleged wrongful acts of the defendant, then in assessing
the amount of damages caused to plaintiff by the alleged
wrongful acts, the jury might consider the loss, if any, to
the plaintiff of probable profits in its business. Defendant
claimed that the evidence pointed to damages too much

in the nature of mere speculative profits to be admissible at all. In response to this contention the supreme court said: "We do not think that in these rulings of the court as to evidence, or in giving the said instructions, there was any error. The profits sought to be proved were not so remote, uncertain, prospective, or conjectural as to be entirely beyond the range of legitimate damages. . . . With respect to this kind of damage, of course, there cannot be the absolute certainty possible in many plainer cases; but a wrongdoer cannot entirely escape the consequences of his unlawful acts merely on account of the difficulty of proving damages; he can do so only where there is no possibility of a reasonably proximate estimation of such damages, which is not the fact in the case at bar. The waters in question here constituted a special salmon fishery,— where those fishes were to be found in great abundance,— and the proposition that damages evidently suffered by plaintiff from the wrongful act of the defendant by which plaintiff was excluded from exercising the clearly valuable right of fishing in those waters are entirely beyond legal proof, cannot be maintained. We think on this point the case at bar is within the rule announced in *Shoemaker* v. *Acker*, 116 Cal. 239, [48 Pac. 62], and cases there cited."

*Shoemaker* v. *Aker*, 116 Cal. 239, [48 Pac. 62] (*supra*), was an action to recover damages for breach of contract. The contract provided that defendant would purchase land and furnish capital for its improvement; that plaintiff would have charge of the improvement and cultivation of the land, and have an interest in the income and profits derived from the sale of the land or its products, and in the increase of value of the land. Plaintiff agreed to devote his whole time and attention to the management and improvement of the property and the sale of the land and the products thereof. After land had been purchased, and after plaintiff had devoted more than a year to its care and improvement, the defendant attempted to annul the contract, by acts which were held to constitute a breach thereof. Referring to the rule of damages stated in section 3300 of the Civil Code, and the subject of future profits, the court pointed out that the cases in which future profits had been rejected as speculative or too remote were cases where the asserted future profits were entirely collateral to

the subject matter of the contract, and not consequences flowing in a direct line from the breach of such contract. It was there held, and authorities were cited to that effect, that profits or advantages which are the direct and immediate fruits of the contract may be recovered, and that the damages claimed in the case at bar were of the kind which are recoverable under the principles stated.

In *Western Union Tel. Co.* v. *Commercial Pac. Cable Co.,* 177 Cal. 577, [171 Pac. 317], the action was one for an injunction to prevent the imposing of a discriminatory regulation and the exaction of a discriminatory toll, and to recover damages for injuries sustained by the demand and exaction. In determining the question of damages for injuries sustained by the demand and exaction, the plaintiff was permitted to introduce evidence showing the injury which plaintiff would sustain through falling off of any business, with consequent loss of profits, as a direct result of such discrimination. This was held to be a proper subject for the admeasurement of damages where the evidence disclosed a reasonable probability of their approximate estimation. The court said: "It admits with no dispute that the plaintiff would have some falling off in business with its consequent loss of profits as a direct result of the discrimination of which it complains. The injury which it would thus suffer through the loss of such probable profits has heretofore been held by this court to be the proper subject of admeasurement of damages in cases where the evidence disclosed a reasonable possibility of their approximate estimation." (Citing *Shoemaker* v. *Acker, supra, Pacific Steam Whaling Co.* v. *Alaska Packers' Assn., supra,* and *McQuilkin* v. *Postal Tel. Cable Co.,* 27 Cal. App. 698, [151 Pac. 21].)

In *Schumann* v. *Karrer,* 184 Cal. 50, [192 Pac. 849], the defendant had leased to the plaintiff a butcher-shop and slaughter-house for the term of two years, and entered into an agreement that during the term of the lease he would not carry on the butcher business in the described vicinity. The action was for an injunction and for damages for plaintiff's breach of this stipulation. The court permitted the plaintiff to give testimony tending to show the value of his business and the loss which would probably ensue from appellant's interference and rivalry; also the loss which he

had sustained by reason of not being able to purchase and fatten hogs and dispose of them, because of appellant's interference with said business. The rule stated in *Shoemaker* v. *Acker, supra,* was repeated and approved, an l applied; it being noted, however, that the damage here in question was in the form of loss of profits to an established business of a permanent character.

In *McConnell* v. *Corona City Water Co.*, 149 Cal. 60, [8 L. R. A. (N. S.) 1171, 85 Pac. 929], the award to plaintiff of damages consisting of profits which he would have made on a contract for the construction of a tunnel was sustained. Referring to the numerous cases wherein damages for loss of prospective profits have been denied upon the ground that they were too speculative and remote, the court said: "Such is the undoubted rule, but it is to be noted that this is not an objection to the inclusion of profits as a proper element of damages, but is a declaration merely that when they are too speculative and remote to be capable of anything like reasonable ascertainment, when they are collateral merely and do not arise directly or by natural consequence out of the tort complained of, they cease to become a proper element in the admeasurement of damages. No one may contest the soundness of this principle, but the converse of it is equally true, that where prospective profits are not too speculative and remote, where they do arise directly and as a natural consequence out of the injury, they are always allowed as an element of damage."

[11] In the case at bar, the contract gave to respondent the exclusive right to sell the described land. Respondent on his part agreed to conduct a campaign for and the business of selling the land to the end that the same should be sold in the shortest possible time, and agreed not to engage in the sale of other land subdivisions during the life of the agreement. The distinction between such a contract and a nonexclusive contract of agency was pointed out in *Friedman* v. *McKay Leather Co.*, 179 Cal. 566, [178 Pac. 139]. It was held that in seeking compensation for breach by the principal of a contract wherein the agency was not exclusive and the agent did not contract to devote his time to the selling of the principal's goods, and where the compensation of the agent was to be a commission on sales made

by him, damages on the basis of the suppositive sales are not recoverable unless it is shown that the sales would in fact have been made by the agent. The court referred to *Parke* v. *Frank*, 75 Cal. 364, [17 Pac. 427], where the court in determining the measure of damages in case of a breach of an agency contract said: "The plaintiffs very properly made no effort to establish the profits they might have made, during any definite period, had defendant complied with his contract. From the nature of the case such damages must have been purely speculative." There is no doubt that the rule thus stated in *Parke* v. *Frank* was properly applied in that case, since the agency there was not exclusive. Also, plaintiff had not agreed to represent the defendant alone, but in fact held other agencies for manufacturers operating in competition with the defendant.

[12] The evidence to which we have referred, upon which finding XXVI must rest, falls into three classes: (a) evidence of sales in other subdivisions, (b) opinions of witnesses that sales could have been made, (c) the quantities of land actually sold by respondent. All of this evidence was admitted over objections urged thereto by appellant. The rulings overruling those objections are duly specified as errors on account of which it is claimed that the judgment should be reversed. The evidence of sales made of land in other places in the San Joaquin Valley at the period of time in question should have been rejected. In itself, it was irrelevant to the issue to be determined, which was whether or not the plaintiff could have sold the Lerdo lands. Conditions with respect to water supply, and other conditions, were different in various particulars in those several tracts from the conditions existing in the Lerdo tract, or which would have existed in the Lerdo tract even if appellant had complied with all of its obligations relating to the development and distribution of water thereon. The evidence of what one set of agents accomplished in the sale of a given subdivision of land is too remote and uncertain in its bearing to be receivable as evidence that another agent could have sold the lands of another subdivision. This evidence could have had no possible relation to the question at issue unless it had been used by witnesses as a basis and reason for their opinion that this particular land could have been sold. Even then, it would not be admissible

unless such opinion evidence was admissible, nor unless brought in by cross-examination after the opinion had been stated. [13] But the opinions of the witnesses themselves were improperly admitted. We think that the correct rule is stated in the note found in L. R. A. 1916B, at page 875: "And opinion evidence as to the value of an exclusive agency contract, and the profits which might have been made, or the amount of business which might have been done under the agency if it had not been wrongfully terminated, is not admissible, since such opinion would be purely speculative and conjectural." In support of the rule thus stated, the note refers to *Wakeman* v. *Wheeler & Wilson Mfg. Co.*, 101 N. Y. 205, [54 Am. Rep. 676, 4 N. E. 264]. In that case the right of the plaintiffs to recover prospective profits lost by them by reason of the conduct of the defendant in preventing them from carrying out the contract was sustained. It was further held that the plaintiffs were entitled to prove the things which they had accomplished under the contract, and the circumstances existing at the time of the breach whereby it appeared that they had suffered damages in some amount and whereby, from the extent of the business done, an estimate could have been made of the value of the contract to the plaintiffs. But on the question of opinion evidence, the court said: "We think the opinions of witnesses as to the value of the agreement, as to the profits which it or any agency established in pursuance of it could produce, as to the damages plaintiffs realized, and as to the number of machines they could have sold were properly excluded. This was not a case for expert or opinion evidence. There was no certain basis of facts proved or facts assumed upon which an opinion could be based. The conflicting opinions of interested witnesses, selected because of their favorable opinions, instead of aiding the jury, would probably add to their embarrassment. The safer rule in all such cases is to exclude opinions, and receive the facts, and then leave the matter for the determination of the jury. They may not have any certain basis upon which to rest their judgment, but that cannot be helped. They are supposed to be disinterested, and must apply their experience and common sense to the facts proved, and reach the best results they can."

[14] The evidence showing the quantities of land sold by respondent, and the rate at which sales were progressing when further performance of the contract by respondent was prevented by appellant, was properly received, and the court did not err in overruling the objections thereto. It was evidence, however meager, tending to prove that further sales could have been made except for the acts of interference by appellant. If the court had received that evidence alone, and had accepted it as proof of the fact that respondent could have sold all of the land within the time limited by the contract, it may be that on appeal the findings would have to be sustained as sufficiently supported by the evidence. But it is doubtful whether upon that evidence alone,—and we cannot satisfactorily hold that upon that evidence alone,—the court would have found it to be true that respondent would have been able to sell all of the unsold lands in the tract. The court having overruled objections to the other evidence to which we have referred, we must assume that weight was given to that evidence in determining the fact. There was evidence tending to prove that the real estate market was less active in the year 1914 than in the year 1913, and had diminished to a state of extreme dullness in 1916. It therefore is not at all clear that the finding in question would have been made if the evidence of sales of lands in other parts of the San Joaquin Valley, and the opinion evidence of witnesses, had been excluded. The erroneous rulings, therefore, must be considered so far prejudicial to the rights of appellant that they cannot be disregarded.

The judgment is reversed.

Shaw, J., and James, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on June 17, 1921, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on July 18, 1921, and the following opinion then rendered thereon:

THE COURT.—In the opinion of the district court of appeal herein it is said that, under the contract of October

2, 1912, no right was given to the Lerdo Land Company to withdraw any land from the terms of said contract upon its determination that water could not be conducted from the wells to the land, or any part thereof, in adequate quantities and at reasonable cost. The court says: "It was not provided that excessive cost of distribution of water produced and developed on any such land would alone authorize appellant to remove that land from the terms of the agreement." The provision of the contract on that subject refers to the reasonable cost of *delivering* the water, as well as the cost of producing or developing it, and it is a matter of grave doubt whether the agreement does not authorize a withdrawal of the land from the agreement by the company, upon ascertaining and determining that the delivery of the water by ordinary ditches could not be made in adequate quantities at reasonable cost. While we deny a rehearing on the petition of the respondent, we think it proper to qualify the opinion in his favor so far as to say that the opinion of the district court on the above question should not be considered as a part of the law of the case upon the new trial to be had therein, but should be left open for consideration, upon such evidence of extrinsic circumstances, if any, as may be properly admitted to explain its meaning, and upon such further consideration as the court below may give to the question of the proper construction of the contract on its face alone upon this point.

The petition for rehearing is denied.

All the Justices concurred, except Wilbur, J., who was absent.