B.F. Prunty in his lifetime was president of the claimant bank. Under date of March 17, 1922, the deceased and other officers and directors of the bank executed the following instrument:
"To Mr. W.J. Murray, "Superintendent of Banking, "Des Moines, Iowa.
"Dear Sir:
"For the consideration of being permitted to carry in the assets certain receivables and real estate referred to below and designated as doubtful by the examiners, we, the undersigned officers and directors of the University State Bank of Des Moines, Iowa, severally guarantee the said bank against loss in an amount not to exceed one hundred dollars ($100) per share of the capital stock of said bank owned by us today and set out opposite our signatures, on the following paper, to wit:
"H.H. Barton, farm of 655 acres, located in Kittson County, Minn.
"C.A. Housh, 120-acre farm, located near Ames, Story County, Iowa.
"Notes as follows:
"Master Truck Tractor Company, including direct and indirect line.
"DeVeny Motor Company, including direct and indirect line.
"It is understood that the management of the bank may have eighteen (18) months in which to collect said paper and that the guarantors will take up any residue unpaid or unliquidated at that time, at the will of the superintendent of banking, in accordance with and to the extent of the above guarantee.
"It is agreed by the undersigned officers and directors of said bank that whatever loss is covered by this guarantee be borne in proportion to stock owned by them in the said University State Bank, and that this guarantee does not exceed the par value of the stock owned. *Page 672 
"It is also understood that the liability of the guarantors under this guarantee in no way affects their further liability as stockholders, and that no stock will be transferred on the books of the bank without the consent of the superintendent of banking.
"Nothing in this agreement or guarantee is construed to prevent the said guarantors from being reimbursed for any losses sustained by this guarantee from future earnings or assessment on the stockholders if approved by said stockholders at a legal meeting.
"Dated this 17th day of March, 1922.
"[Signed] B.F. Prunty 124 "R.A. Crawford, 5 shares "B. Frank Prunty, 121 "A.M. Haggard, 80 "G.N. Sherman, 10 shares "W.S. Hartsook, 5 shares "B.D. VanMeter, 16 shares."
This instrument was given pursuant to letter from the state banking department to the claimant bank, dated March 15, 1922, reading as follows:
"I am enclosing form of guarantee very similar to that furnished by yourselves when in your office but having several additional features that we think will clear up any misunderstandings that might grow out of the matter. We especially think that the last paragraph is one that should be inserted for the protection of you men in case you need to take care of losses that belong possibly to all stockholders. If this is satisfactory please have it signed as individuals, inserting the number of shares of stock after each signature on the sheet. You understand that the officers sign individually and not officially. A carbon copy of this guaranty is enclosed for your files. We have consented to this temporary disposal of the matter, considering that with this guaranty the capital stock at the present time is unimpaired. We will leave your bank in the particular charge of an examiner, who will keep in close touch with conditions, with a possibility of eliminating smaller doubtful lines in the meantime."
B.F. Prunty continued as president of the bank until the *Page 673 
date of his death, March 12, 1923. B. Frank Prunty, his son and one of the executors and one of the signers of the agreement, was cashier, and continued to be such for some months after his father's death. The signers of the agreement were the owners of shares in the bank to the number set opposite their signatures. Some of the signers have paid, as provided by the contract. Some have not. This claim was filed September 8, 1923. On December 20, 1923, the banking department wrote to the then cashier of the claimant bank, as follows:
"The department holds a guaranty signed by the directors of your bank, dated March 17, 1922, covering certain doubtful receivables, said guaranty being proportionate to the shares held by each director. It was the understanding had, that the bank would have eighteen months in which to collect the paper so guaranteed. The time having now elapsed it is the request of this department that you proceed to collect under the guaranty. You will kindly advise this office that you will comply with this request?"
[Signed]
"P.S. I believe you have a copy of the guaranty. If not, advise us, and we will furnish same."
The claimant's cashier, on December 28, 1923, replied, acknowledging receipt of the letter, and stating that the guarantors had on that date been notified to pay within 30 days the full amount of their liability under the guaranty. On the same date, a letter was sent by the cashier to the executors, stating:
"Pursuant to instructions from the state banking department under date of December 20th, 1923, you are hereby required within thirty days from date hereof to pay in to the University State Bank the full amount guaranteed by said deceased under date of March 17th, 1922, to cover certain doubtful receivables held among the assets of the University State Bank which have not been collected within the time specified in said guaranty. The amount due from you as said executors on account thereof is $12,400. A claim for this amount was filed against you in the probate court of this district under date of September 8th, 1923."
The item referred to in the agreement as the Barton farm *Page 674 
represented originally an $8,000 note given by Barton, to which were added advancements for taxes and accumulated interest, bringing the amount up to $14,700. This was secured by a mortgage upon the land in Minnesota to which reference is made in the agreement. The prior incumbrance was such that the security was worthless. The. C.A. Housh item refers to a piece of land in Story County that had been acquired by the bank on a trade. It was subject to prior incumbrances to the amount of the value of the land or more. The bank was threatened with a claim for personal judgment for deficiency, and after decedent's death, relinquished to the prior mortgagee all its claim to the land. This farm was carried on the books of the bank as an asset to the amount of $16,650, which represents the value of automobiles traded by the bank for the land. The other two items mentioned in the agreement represented personal obligations, one of them amounting to $43,000 and the other to $4,300. There has been some charging off in reference to these last two items, the particulars of which are not shown. The testimony as to the amounts of the items, as given by the bank examiner and by the new president and new cashier of the bank, and as to just how and where they were carried, is not altogether clear or without variances. A published statement by the bank, made shortly before the trial, shows undivided profits amounting to $34,844.08. One of the witnesses thought that this included $10,600 collected from other signers on the guaranty. There is no evidence as to what became of decedent's stock, other than that the executors have disposed of it. No bad faith on the part of the bank or its management or of the banking department is claimed. The bank is still in operation.
I. Appellants objected to some of the testimony when offered to show that the amounts were a total loss, and that the bank had been diligent since decedent's death in the effort to make collection. Much of the testimony on these subjects was not objected to at the time it was offered. The witnesses were cross-examined elaborately, and the details, so far as known by the witnesses, brought out on cross-examination; and the witnesses also produced on cross-examination a number of original documents on account of the absence of which defendants were *Page 675 
complaining. At the close of plaintiff's evidence, the defendants made a general motion to strike, out all of plaintiff's testimony, as well as to direct a verdict. To treat in detail the record relating to this point would unwarrantably protract the opinion. We find sufficient evidence in the record, competent or not objected to at the time it was offered, and elaborated on cross-examination, and uncontradicted, to require a finding that the bank has sustained a loss on the items named in the agreement to an amount much in excess of the entire amount agreed to be contributed. The court below was not in error in finding this fact established. The rulings on evidence were not erroneous, and were without prejudice.
II. The appellants elaborately argue the construction and effect of the contract. We confine ourselves to appellants' principal contentions.
It is strenuously urged that the contract is one of guaranty; that it is with the superintendent of banking, and not with the bank; that the superintendent of banking, as a party to the contract, represents the depositors, and not the bank.
It is inaccurate to speak of the contract as one of guaranty. It is one of indemnity, and it is to indemnify the bank against loss on the stipulated items. 28 Corpus Juris 892; 31 Corpus Juris 419. The language of the contract itself, 1. INDEMNITY: while it is addressed to the superintendent of indemnity banking, is plainly one of indemnification of to bank: the bank from loss. It must be held to have been construc- accepted by the bank. Appellants' effort to tion. reframe the instrument so as to make it read, "We, the undersigned, officers and directors of the University State Bank of Des Moines, severally guarantee to Mr. W.J. Murray, Superintendent of Banking, Des Moines, Iowa, the said bank against loss," etc., is a perversion of its language and meaning. The superintendent of banking or the state had no personal interest in the transaction. The rights of depositors were most effectually conserved by maintaining the solvency and prosperity of the corporation. The interests of the decedent and the depositors in this regard were identical. The value of the assets of the bank as a going institution, and the security of the depositors, their ability to obtain payment of checks in the regular course of business, rather than to finally *Page 676 
draw out the deposit in the form of the dividends of a receivership, were of vital importance to them, as well as to stockholders. On well settled principles, the promise was made for the benefit of the bank, and (it being otherwise unobjectionable) the bank may recover thereon. Marble Sav. Bankv. Mesarvey, 101 Iowa 285; Chicago, R.I. P.R. Co. v. City ofOttumwa, 112 Iowa 300; Gould v. Gunn, 161 Iowa 155. If this were not true, still by express statute the bank is authorized to recover. Code of 1924, Section 10982; Grennell v. Cass County,193 Iowa 697, 704.
It is urged in support of this contention that no consideration moved from the bank to Prunty. In the first place, this was not necessary (cases above cited); and in the second place, the signers of the agreement were interested in 2. INDEMNITY: keeping the bank open and making good the indemnity impairment of its capital. This was a sufficient against consideration for their obligation, and inured impairment to their benefit. Interstate Tr. Banking Co.
of bank v. Irwin, 138 La. 325 (70 So. 313). The capital: instrument is not one (except consequentially) considera- to indemnify the depositors against loss. It is tion. to indemnify the bank. The signers were interested in the bank and in its recuperation. Money paid on the obligation would become the property of the bank, whether they intended to make a donation or that the other stockholders should share in the benefit thereof or not; and necessarily the property in the obligation and the right to enforce its performance were in the bank. Wright v. Gurley, 133 La. 745 (63 So. 310); InterstateTr. Banking Co. v. Irwin, 138 La. 325 (70 So. 313). The signers were conducting a quasi public institution, under the supervision of the state banking department. Undoubtedly they published the required statements while they were in control, as their successors did after them. Those statements and their permission to continue in the operation of the bank and to receive money on deposit, as authorized by the state, were founded, in part at least, upon this agreement; and the indemnitors will not be permitted to deny its efficacy. Kennedy v. Young, 136 La. 674 (67 So. 547); Paulyv. O'Brien, 69 Fed. 460.
III. It is urged that the claim was prematurely filed; that the superintendent of banking did not require payment; and *Page 677 
that no demand for payment was made. The law limits the time for filing claims against an estate, and claims 3. EXECUTORS must, to be recoverable, be filed within the AND prescribed time, regardless of their maturity. A ADMINISTRA- claim not filed within six months is postponed TORS: in payment to claims filed within that time. claims: Claimant was only performing its duty and premature asserting its rights in filing the claim so as filing. to get the advantage of position. The superintendent of banking did, after the expiration of the 18 months, require the bank to proceed with the collection. Demand for payment was made. It is immaterial that the demand to proceed and the demand for payment were made after the claim was filed.
It is urged that the executors, on making payment, would be entitled to immediately sue the bank to recover the amount paid, together with expenses of their defense. The contract does not so read. They may be reimbursed from "some future earnings or assessment of the stockholders if approved by said stockholders at a legal meeting." It is not shown that future earnings have been made, or that the stockholders have approved reimbursement. The money, when paid in, as has been noted, will belong to the bank.
It is objected that the guaranty in terms of two farms is meaningless. The indemnity agreed upon is against loss upon stated items. The items appear on the records of the bank, and the meaning of the instrument in respect to them cannot be doubted.
It is said that there can be no recovery for what has been charged off. The charging off is most persuasive evidence of the existence of a loss, and the loss is not less 4. BANKS AND from the fact that it is so shown by the books. BANKING: indemnity We should, perhaps, add that the foregoing against discussion is not to be construed as an loss: intimation of opinion upon the rights of the "charging representatives of the estate, as between them off" item and the other contributors or stockholders, nor of loss: as foreclosing any right to contribution or effect. reimbursement on proper proceedings between necessary parties. We are not to be understood as expressing any opinion upon *Page 678 
those questions, nor upon the effect thereon of future developments from the operations of the bank.
The judgment is — Affirmed.
De GRAFF, C.J., and EVANS and ALBERT, JJ., concur.