(63 South. 310.)

No. 19,799.

WRIGHT et al. v. GURLEY et al.

(June 30, 1913. On Application for Rehearing, Oct. 20, 1913.)

*(Syllabus by Editorial Staff.)*

1. BANKS AND BANKING (§ 131*)—DISSOLUTION—DISTRIBUTION OF SURPLUS.

Plaintiffs were stockholders in a bank whose capital had been impaired and whose officers had been notified that, unless the impairment was made good, the bank would be closed. It was considered undesirable to go into voluntary liquidation or to remedy the impairment by an assessment of the stockholders or by a reduction of the capital thereof, either of which courses would have made public the bank's condition and probably have caused a run on the bank. Plaintiffs accordingly discounted their notes with other banks, placing the proceeds, $98,000, to the credit of their bank with the clear understanding and intention that it was necessary to increase the assets of the bank without increasing its liabilities, and that loans to the bank would not accomplish this purpose as they would correspondingly increase the bank's liabilities. After continuing in business for a short time, liquidation was decided upon, and $58,000 of the money advanced by plaintiffs was used in satisfaction of the bank's liabilities, leaving a surplus of $40,000, which plaintiffs claimed. *Held* that, though plaintiffs did not intend to make a donation of the money advanced to their fellow stockholders, they did intend to make a donation thereof to the bank, which therefore became the absolute and unconditional owner thereof without any liability to return it to plaintiffs, and hence the surplus belonged to all of the stockholders and should be distributed ratably among them.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 316–318, 333; Dec. Dig. § 131.*]

2. SUBROGATION (§ 23*)—PERSONS ENTITLED.

Plaintiffs were not entitled to be subrogated to the rights of the creditors whose claims were paid from the $58,000, since, the money having become unconditionally the property of the bank, such debts were paid by it with its own money and not by plaintiffs with their money, and hence two of the essential requisites for subrogation were absent.

[Ed. Note.—For other cases, see Subrogation, Cent. Dig. §§ 60–66; Dec. Dig. § 23.*]

3. BANKS AND BANKING (§ 81*)—DISSOLUTION—DISTRIBUTION OF SURPLUS.

Such surplus could not be distributed to plaintiffs on broad principles of equity and justice, since, under the express provisions of Civ. Code, art. 21, courts may decide according to equity only, in the absence of express law, and by express law the surplus of the assets of a corporation in liquidation, after payment of its liabilities, belongs to the stockholders and must be distributed among them ratably.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 197; Dec. Dig. § 81.*]

4. BANKS AND BANKING (§ 81*)—REIMBURSEMENT FOR ADVANCES.

Plaintiffs could not recover such surplus on the theory that in advancing such money they were acting as the negotiorum gestores of their fellow stockholders, especially as a negotiorum gestor is entitled to reimbursement for whatever moneys he is out of pocket, and therefore, if plaintiffs had been the negotiorum gestores of their fellow stockholders, they would be entitled to recoupment from their fellow stockholders for their share in the $58,000 as well as being entitled to the surplus.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 197; Dec. Dig. § 81.*]

Appeal from Civil District Court, Parish of Orleans; Porter Parker, Judge.

Suit by J. W. C. Wright and others against W. Morgan Gurley and others, liquidators of the People's Bank & Trust Company. From a judgment in favor of defendants, plaintiffs appeal. Modified and affirmed on rehearing.

Denegre & Blair, of New Orleans, for appellants. Dufour & Dufour, of New Orleans, for appellees.

PROVOSTY, J. [1] The plaintiffs, 17 in number, were stockholders of the People's Bank & Trust Company, of which the defendants are the liquidators. Sixteen of the plaintiffs, with seven other stockholders, constituted the board of directors of said bank. The State Examiner of State Banks having found that the capital of the bank was impaired, the State Auditor of Public Accounts notified its officers that, unless said impair-

ment was made good, the bank would be closed. The regular way of remedying this impairment would have been by an assessment of the stockholders or else by a reduction of the capitalization. Another alternative was going into voluntary liquidation. Any one of these modes was highly undesirable, for reasons tersely stated in the brief of plaintiff's counsel as follows:

"The adoption of any one of the above courses meant making public the condition of the bank, and consequently ruin. Publication would have precipitated a run, and the bank was in no condition to stand a run. Not only this, but a run on the bank would inevitably have led to the withdrawal of timid depositors from other banks and been menace to the community. Banks can only exist by investing the funds of their depositors, and experience and the law recognizes that, under ordinary circumstances, they are only required to keep on hand in cash a sum equal to 25 per cent. of their deposits. No bank, therefore, can stand a run or demand for immediate repayment of deposits, a demand which is only made when depositors are fearful of the bank's condition. Failure of the People's Bank through a run would, in all human probability, have involved other banks and the community at large and would certainly have involved the loss of the entire capital stock of the bank and caused a loss not only to the stockholders of the People's Bank but to its depositors."

The plaintiffs would have been willing to lend largely to the bank, but such loans would in no way have improved the situation, since they would have correspondingly increased the liabilities. The only way, apart from liquidation, was either to reduce the liabilities or the capitalization by an amount equal to the impairment or else increase the assets. This last was evidently the best; but how accomplish it, without an assessment of the stockholders, which might, and more than likely would, prove disastrous.

After canvassing the situation, the plaintiffs decided to execute their joint and several notes and discount them in other banks and have the proceeds placed to the credit of the embarrassed bank. And this they did; and they allege as follows:

"That, in furnishing the People's Bank with said $98,000, your aforesaid petitioners, who executed the notes for said amount, did so solely for the purpose and with the expectation of enabling the said bank to continue business for the benefit and in the interest of all the stockholders and to avoid the sacrifice and loss of its established business and good will and to protect the common interest and fund of the stockholders as hereinbefore set forth; that it was the expectation and understanding of the directors that by the use of said funds the bank could continue in business and eventually earn the amount thereof, so that the same could be restored to the makers of said notes without any violation of its legal obligations to creditors or the state, and the said notes could gradually be retired, or the amount thereof repaid to petitioners, and petitioners confidently believed and expected that they would never be called upon to pay the whole of said notes out of their own personal funds but that ultimately their fellow shareholders, for whose common benefit and protection the money had been furnished and who, to the extent of their interest in the assets of the bank, were bound with them for the payment of its debts, would contribute to the payment of said notes or to the reimbursement of the makers thereof."

But, while the plaintiffs thus allege that it was their "expectation and understanding" that the amount thus placed by them to the credit of the bank would be returned to them, they cannot and do not deny that the thing required by the State Bank Examiner to be done, and which they proposed doing by the said deposit of their money, was to increase the assets of the bank by that much, without increasing its liabilities in the slightest degree, in any way, shape, or form; and that they made said deposits with that clear understanding and intention.

Thus reinforced, the bank continued in business ten months longer, when liquidation was decided upon, and a contract was entered into with another bank by which the assets and business were transferred to this other bank in consideration of a bonus of $37,500, and this other bank assumed all liabilities to depositors and creditors and agreed to account for any surplus remaining out of the assets after the settlement of all liabilities. Included in the assets thus transferred

was the amount contributed by the plaintiffs, which had remained intact on deposit where placed by them to the credit of the bank. Out of the assets, including the $98,000 of plaintiffs and the $37,500 bonus, all the liabilities of the bank were settled, and a surplus of $40,000 was left. The defendant liquidators propose to treat this surplus as belonging to the bank, like any other part of its property, and to distribute it among the stockholders. The plaintiffs claim that it is in reality their money and should be returned to them, and no part of it paid to the other stockholders. As a matter of fact, the $98,000 of plaintiffs remained on deposit, where they had placed it, until the other assets of the bank, including the $37,500 bonus, had been used in settling the liabilities, and the necessity arose for withdrawing $58,000 of it for meeting a like amount of. the still unsatisfied liabilities; and this $40,000 surplus is therefore in reality nothing more than the remainder of the fund never withdrawn from the deposit.

In support of their claim the plaintiffs argue as follows:

"The plaintiffs who advanced the $98,000 did not donate that sum to the stockholders. It is no answer to point out that they transferred title to the $98,000 to the bank. The transfer of title made the sum liable to the depositors and creditors but did not make it a donation to the stockholders. No one is presumed to give; and the plaintiffs had no intention of giving; they intended to subject that sum to the claims of the depositors and creditors but no more. As to the stockholders, they had not the remotest intention of divesting themselves of that sum. Analyze the transaction itself without evidence of any kind, and it is impossible to conceive that the plaintiffs had any intention of making a present of $98,000 to their fellow stockholders, and there is no evidence to that effect. That they placed themselves in a difficult position and may have had no clear idea of how they were to get this money back does not affect the question. It will not do to say that they gave it to the stockholders when it is positively shown that they had no such intention. They had no more intention of giving the money to the stockholders than you or I would have given our real estate to a third person, if we placed title in his name, without taking a counter letter. The only difference between the two cases is that in the case of real estate the law bars parol proof. In the other parol proof is permissible. In both, however, the transfer of title to the bank in the one case and to the third person in the other case enables the third person and the stockholders of the bank to assert claims without just foundation."

The plausibility of this argument results from the substitution of the stockholders to the bank as the beneficiary of the donation. Very true the plaintiffs did not intend to make a donation to their fellow stockholders and did not do so; but they intended to and did make a donation to the bank. Their only purpose in the transaction was that the bank should become the owner of the amount in question. Not the conditional owner, not the owner with a string to the gift, but the absolute, unconditional, untrammeled owner. The contribution, coupled with a condition of any kind, would not have answered the purpose. The. Bank Examiner had so informed the plaintiffs; and they understood perfectly, therefore, that they were divesting themselves now and irrevocably of this money and investing the bank now irrevocably and unconditionally with it. The money became the unconditional and absolute property of the bank, with no liability whatever resting upon the bank for the return of it; and from this the consequence inevitably follows that it belongs to the stockholders and must be distributed ratably among them.

[2] Plaintiffs seek to obtain a foothold in argument by claiming to have been subrogated to the creditors of the bank, whose claims, to the amount of $58,000, were paid out of this contributed money. The answer is that this payment of debts was made after the money had become irrevocably and unconditionally the property of the bank just as much so as any of its other property, so that, as a matter of fact, the debts were paid by the bank itself and with its own money and not by plaintiffs with their money; and, in

consequence, two of the three essential requisites for subrogation are absent.

[3] Next, plaintiffs say that they are entitled to this money on broad principles of equity and justice. The answer is that our courts are allowed to decide according to equity only in the absence of express law (C. C. 21); and that, in the present case, there is the express law that, after payment of all the liabilities of a corporation in liquidation, the surplus of the assets belongs to the stockholders and must be distributed among them ratably. For removing the case from under this law, the plaintiffs would have to show that this money did not belong to the bank; and this they not only do not show but do not even pretend. If, despite the plain facts to the contrary, they could succeed in making such a showing, they would thereby falsify the books of the bank and the sworn statements made and published by themselves of the affairs of the bank, as required by law, and in so doing convict themselves under section 871 of the Revised Statutes and under the several other criminal statutes bearing upon the conduct of bank officials.

[4] We have considered whether, in view of the immensely strong equities of the case, the plaintiffs, in furnishing this money, were not acting as the negotiorum gestores of their fellow stockholders and whether, therefore, some legal rights did not accrue to them in that way enforceable by the present action. But we have concluded that this argument would have the fatal defect of proving too much. For, if good at all, it would prove that the plaintiffs had acquired a right of action not merely for claiming this surplus of the bank's funds but for recoupment from their fellow stockholders for the share of the latter in the $58,000. A negotorium gestor is entitled to be reimbursed whatever moneys he is out of pocket in the business he has attended to; therefore, if plaintiffs had been the negotiorum gestores of their fellow stock-holders, they would be entitled to sue them for their pro rata shares in the fund thus contributed in the common interest. Clearly the plaintiffs could not possibly lay claim to any such right; and it necessarily follows that they cannot have been negotiorum gestores. Indeed, the learned counsel for plaintiffs have not contended that they were.

Judgment affirmed.

## On Application for Rehearing.

PER CURIAM. Our attention being now called to a document filed in the record wherein the holders of 1,801 shares of stock in the People's Bank have transferred to plaintiffs their interest in the fund in the hands of defendant liquidators.

It is ordered that our former decree herein be set aside; and it is further ordered, adjudged, and decreed that there be judgment in favor of plaintiffs and against defendants maintaining the injunction issued herein as to the sum found to be due to the stockholders who signed the act of transfer to plaintiffs above referred to and no further; and that, as thus amended, the judgment appealed from is affirmed. Rehearing refused. The right is reserved to all parties to apply for a rehearing within the legal delay from date.