[Civ. No. 3972. Third Appellate District.—January 27, 1930.]

## P. J. DUDLEY, Respondent, v. CITIZENS STATE BANK OF SANTA MONICA, Appellant.

Samuel J. Crawford, Hill, Morgan & Bledsoe and Vincent Morgan for Appellant.

Miller & Ellis, K. A. Miller and Fredericks & Hanna for Respondent.

PLUMMER, J.—The plaintiff had judgment in an action prosecuted against the defendant to recover the sum of $10,400. From this judgment the defendant appeals.

The complaint in this action is in nine counts. The first count is for the sum of $10,400, alleged to be for money had and received from the plaintiff for the benefit of the defendant, this sum being made up of the following items, to wit: The sum of $3,000, alleged to have been paid by the plaintiff to the defendant, for its use and benefit, on or about the first day of November, 1923; the sum of

$1400, alleged to have been paid to the defendant by the plaintiff, for its use and benefit, on or about the sixth day of February, 1924; the sum of $5,000, alleged to have been paid by the plaintiff to the defendant, for its use and benefit, on or about the eleventh day of February, 1924; and the further sum of $1,000, alleged to have been paid by the plaintiff to the defendant, for the latter's use and benefit, on or about the second day of March, 1924. The next four counts are for the sums respectively mentioned, alleged to have been loaned to the defendant by the plaintiff at the defendant's special instance and request. The last four counts in the complaint relate to the separate items herein mentioned, and each is in the form of a count for money loaned and advanced the defendant, without consideration, to plaintiff, and for the use and benefit of the defendant. The answer consists of specific denials to each count. No affirmative defense is pleaded in the answer. The trial court made a general finding to the effect that all the allegations of the plaintiff's complaint are true and correct and, likewise, a general finding to the effect that the denials in the answer were and are untrue. The specifications of error simply raise the question as to the sufficiency of the evidence to sustain the finding of the court that the respective allegations of plaintiff's complaint are true. Neither the answer of the defendant nor the specifications of error raise any question as to the voluntary character of the payments made or of the money advanced by the plaintiff to and for the uses and benefit of the defendant. While the argument of the appellant is devoted chiefly to what the appellant calls the "voluntary character of the payments and advancements of money made by the plaintiff," the question of voluntary payment does not otherwise arise unless the testimony introduced by and on the part of the plaintiff establishes such fact in such a conclusive manner as compels this court to overturn the findings of the trial court to the effect that the money involved in this action was loaned by the plaintiff to the defendant, or that the money was advanced by the plaintiff to the defendant for its uses and benefit, without consideration.
If all the other allegations of the complaint, found to be true by the court, are unsupported by the testimony, yet from the finding of the court that the plaintiff advanced money

to the defendant for its uses and benefit, without consideration, the law implies a promise to repay the same, and such finding, if supported by the testimony, would be sufficient to support the judgment. As we have stated, the defendant tendered no issue of voluntary payment by its pleadings, and introduced no evidence of such voluntary character of the payments, and bases its appeal wholly upon the testimony of the plaintiff. Reference is made to some contradictory testimony, but this only raises a conflict and furnishes no ground for reversal. Not having tendered any issue as to the alleged voluntary character of the payments or advancements of money by the plaintiff to the defendant, and not having raised any such question by specification of errors, it is a very doubtful question whether, under section 648 of the Code of Civil Procedure, the contention of the appellant can be considered. (21 Cal. Jur. 136; 2 Cal. Jur. 705-712; *Mills* v. *Brady,* 185 Cal. 317, and cases cited on page 321 [196 Pac. 776, 778].) However, we will not base our decision upon any technical rules of pleading, but will confine ourselves to a consideration of whether the money was advanced, as alleged by the plaintiff, to the defendant for its uses and benefit, without consideration and under such circumstances that the law would imply a promise of repayment and an obligation to repay the same upon demand.

The transcript shows that the Citizens State Bank of Santa Monica was organized sometime during the year 1922, and opened its doors for the transaction of business in January, 1923. The par value of the capital stock of the bank was fixed at the sum of $100,000, the stock being sold at $110 per share—$100 as the par value of the stock and $10 on each share sold being credited to what was called the "surplus account," this account being created in this manner for the evident purpose of paying organizing and operating expenses until the business of the bank was sufficient to put it upon a paying basis. Shortly after the bank began business it organized and established a branch at a place called "Ocean Park," a suburb of Santa Monica. The plaintiff in this action was, during all the time covered by this testimony, the vice-president and executive officer of the Citizens State Bank of Santa Monica. The plaintiff's son, Arthur Dudley, was first assistant manager, and

for a while served as manager of the Ocean Park branch. During the latter part of the year 1923, the plaintiff P. J. Dudley, having had introduced to him a man by the name of "Hurd," cashed a check in favor of Hurd and drawn by Hurd on the Citizens State Bank of Santa Monica for the sum of $3,000. This transaction may be summarized as follows: On or about the twenty-first day of October, 1923, a man by the name of Hurd came into the bank of which the plaintiff was the manager, accompanied by one Homer Johnson, an acquaintance of the plaintiff; Johnson introduced Hurd, stating that they were associated in some deal, and that Hurd desired to make a deposit and open an account; thereupon Hurd presented three different checks aggregating approximately $40,000, all of which were signed by third parties in favor of Hurd; two of the checks were drawn upon banks in the neighboring town of Inglewood; the third purported to be a check certified by the cashier of the American National Bank of Pomona; the checks were received by Dudley and an account opened by the bank in the name of Hurd; thereupon, Hurd immediately drew against the account in the sum of $3,000, writing a check therefor, which the plaintiff directed the teller in the bank to pay; this sum was paid by the teller to Hurd in currency; no investigation was made of Hurd, nor as to the genuineness of the checks deposited by him; Hurd gave as an explanation for drawing out so much currency that he was going to buy some real estate; the plaintiff, upon cross-examination, was not able to tell just what reasons Hurd assigned for drawing the cash instead of using checks; in a short time it developed that the checks aggregating the aforesaid sum of $40,000 were all forgeries; Hurd was arrested, convicted and sent to prison. On or about the first day of November, 1923, the plaintiff deposited in the defendant bank the sum of $3,000, making the deposit in the form of a check signed by him, payable to the order of Citizens State Bank, in said sum, with the words "for to take up Hurd check." This money was paid into the defendant bank on or about November 21, 1923. No report was made of this transaction to the directors by the plaintiff, and it does not appear that any of the directors knew of the transaction with the exception of Mr. McClellan, who was the president of the bank, and Mr. Miller, who

was one of the directors. The plaintiff testified that he had a conversation with McClellan in relation to this transaction and that McClellan requested him not to report the transaction to the directors. The plaintiff, among other things, testified that his idea was that he was extending a credit to the bank because the money went into the bank; that he put up the money to take care of the situation until either the directors or the bank could arrange the matter; that he had the interest of the bank at heart, and put up the money in good faith. The plaintiff further testified that in his conversation with McClellan, the president of the bank, it came to the question of taking care of the loan temporarily, the plaintiff's language being as follows: "Then it came to the question of taking care of the loan temporarily. I would be willing to furnish the funds temporarily, provided I would get it back again. He said that would be agreeable to him. I suggested that I was ready to make a report to the Board of Directors. He asked me not to do that; he said, 'Leave it to me.'" The plaintiff further testified as follows: "I didn't consider myself in anyway obligated to pay any of this $3,000.00. I had the interest of the bank at heart, and I put the money up in good faith. If I had known that it was not going to be paid back, that he was not going to take the matter up and see that I got it back, I would not have put up my check." This testimony was contradicted by Mr. McClellan, but it appears from the testimony of the witness Miller that the plaintiff and McClellan did have a conversation which in substance was practically the same as the conversation related by the plaintiff, and sufficient to justify the trial court in coming to the conclusion that the plaintiff had given a correct version of the conversation he had had with the president of the bank relative to the $3,000 transaction. The minutes of the board of directors show that at a meeting held on the twentieth day of November, 1923, the loss of $3,000 by the bank was discussed by the board. The remainder of the money claimed by the plaintiff as due him from the defendant is based upon a transaction had with a man by the name of "W. F. Sharpless," otherwise known as "L. J. Mills." It appears from the transcript that a man by the name of "Sharpless" did business with the Ocean Park branch of the defendant bank,

under the name of "Sharpless," and also under the name of "L. J. Mills"; that Sharpless was engaged in selling automobiles and the branch bank handled a great deal of his paper. During most of the time the bank was handling Sharpless' paper, his account was overdrawn. Finally it appears that during the early part of the year 1924 Sharpless deposited several checks with the Ocean Park branch bank of the defendant and drew thereon various sums, so that unless the checks just referred to were genuine, his account would stand overdrawn in the sum of $7,400. As subsequent events proved, the checks which we have just referred to as deposited by Sharpless were all returned to the Ocean Park branch bank of the defendant as worthless, he having no funds in the bank upon which they were drawn. Upon being informed by his son of the worthless character of the checks drawn by Sharpless, and that they were being returned, the plaintiff deposited the various sums mentioned in his complaint, aggregating a total of $7,400, in the Ocean Park branch bank of the defendant. His testimony was that he directed his son to hold the money until the whole matter was fixed up. A. V. Dudley, as manager of the branch bank, turned the money into the bank and carried it upon the books as so much cash. The deposit slips in the handwriting of the plaintiff show that the money just referred to was deposited at various times to the credit of, or on account of Sharpless and Mills. It does not appear from the records of the defendant bank that any report of these transactions was made by the plaintiff, or by A. V. Dudley, or that the directors of the bank understood the same until after the plaintiff had severed his connection with the defendant bank. The plaintiff, upon cross-examination, testified as follows: "I put in this money in the hope that Sharpless would later come along and make good the amount he had received from the draft which had been dishonored, and that if he did not do it, I would go to the Board of Directors and lay the situation before them to see if I could not get my money back, and, further, as to one of the transactions my idea was that if the bank did not repay me, the Directors would, and that if the Directors wouldn't that the bank would; I had nothing definite as to which would. My idea was that I was extending a credit to the bank because the money

440

went into the bank.'' Upon this testimony, and more along the same line which does not change the effect of what we have set forth, it is contended by the appellant that a voluntary gift, and not a loan is established; that while the money was advanced without any consideration on the part of the plaintiff, and went into the funds of the bank, the plaintiff was simply replacing in the bank funds which had been improperly paid out either by himself, from the defendant bank, or by his son from the Ocean Park branch bank. Without further consideration, or without regarding the official character of the plaintiff, and the fact that he was charged with the management of the bank and the control of its funds and the law relating to the maintenance of a surplus by banking corporations, it might be that we would have to state, as a matter of law, that the transaction disclosed constituted voluntary gifts, and that none of the money could be recovered. Under the law, the directors of the bank were charged with maintaining a sufficient sum of money in the defendant bank to meet its obligations, and this duty, as the executive officer of the bank, devolved upon the plaintiff. While it was not his duty to supply funds to keep the surplus account intact, it was a duty chargeable against the bank. Section 21 of the California Banking Act (Stats. 1909, p. 87), as amended in 1913 (Stats. 1913, p. 147), and as it was in force at the time of the transactions considered herein, required the maintenance of a surplus, and provided a method for raising and maintaining a surplus. The procedure there set forth would ordinarily consume considerable time. The surplus of the defendant bank, as disclosed by the testimony, amounted to the sum of $10,000. The losses incurred, as disclosed by the record, aggregated $10,400. The testimony of the plaintiff is to the effect that the bank needed or required the money, although the bank was not shown to be insolvent. Insolvency, however, is a different matter from not having ready cash, and if the testimony of the plaintiff is true, that he put up his money temporarily until it could be otherwise taken care of by the directors of the bank, then and in that case it was only an expedient to maintain the funds of the bank unimpaired until section 21 of the Bank Act could be complied with. This would amount, in law, to a loan to the bank, and at

least to an advancement of money to the bank, not as a gift, but without any binding obligation upon the plaintiff, and in such manner as would entitle him to recover the same. It is argued by the appellant that if the plaintiff deposited the $1400 in the bank, as claimed by him, to maintain its reserves, then and in that case the repayment to the plaintiff of the amount which he had so deposited would leave the reserves of the bank in the depleted condition existing just prior to plaintiff making deposit of the money as alleged. This is true, but section 21 of the Bank Act and other sections of the Bank Act provide the procedure for taking care of just such situations. The fact that the plaintiff did not report the Sharpless transactions to the board of directors constituted a circumstance which the trial court was authorized to take into consideration in determining the credibility of the plaintiff as a witness in this case, and if the court resolved this incident in favor of the plaintiff, and as not affecting his credibility, we are not in a position to overthrow the holding of the trial court simply because it is strongly urged that such fact does materially affect the credibility of the witness, even though we might agree with the contention of the appellant in this particular. The appellant cites a number of authorities relative to voluntary payments, which we need not consider for the reason that the court has held otherwise upon testimony sufficient to sustain its findings, even though we might conclude differently upon the same testimony. The cases cited by appellant, based upon the text found in 7· C. J. 492, are not controlling here. The text in Corpus Juris, relative to this subject, reads as follows: "The capital stock of a bank is a trust fund for the benefit of depositors and creditors, and must be kept unimpaired, for which purpose an assessment may be levied on the stockholders in case a deficiency arises through losses or otherwise. Where the directors of a bank, in response to a demand of the state bank examiner, that they make good an impairment of the capital stock, sign and discount their personal note and deposit the proceeds to the credit of the bank, the transaction is a donation or gift to the bank." (Citing *Interstate Trust etc. Co.* v. *Irwin*, 138 La. 325 [70 South. 313]; *Wright* v. *Gurley*, 133 La. 745 [63 South. 310].) An examination of these cases shows that the directors had en-

tered into an agreement with the bank examiner to pay so much money into the bank to make up a deficit in its assets in lieu of levying an assessment, and that the various sums contributed were contributed unconditionally and as a gift to the bank.

A review of the authorities cited by the respective counsel would serve no useful purpose. It is sufficient to say that if the circumstances show a voluntary payment, or a payment under circumstances where the law implies a gift, no recovery can be had. On the other hand, if the money is advanced, under such circumstances, by one having charge of the management of the affairs and business of the corporation, as to raise an implied contract to repay the same, judgment for repayment will be entered, and thus, if the court, upon sufficient testimony to sustain its findings, concludes that the money was paid under circumstances where the law would imply a promise to repay, further argument is foreclosed. While we appreciate the force of the appellant's argument, it comes down to a question of fact, and that, having been found by the trial court against the contentions of the appellant, we have no recourse but to affirm the judgment, and it is so ordered.

Thompson (R. L.), J., and Finch, P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on February 26, 1930, and a petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 27, 1930.

All the Justices concurred.