[Civ. No. 5205. Third Appellate District.—March 14, 1935.]

CALISTOGA NATIONAL BANK (a Corporation), Respondent, v. FIDELITY AND DEPOSIT COMPANY OF MARYLAND (a Corporation), Appellant.

Thomas E. Davis for Appellant.

Clarence N. Riggins for Respondent.

PLUMMER, J.—This cause is before us upon an appeal by the defendant from a judgment against it for the sum of $5,550 and interest and costs upon a Fidelity bond theretofore executed and delivered by the defendant to the plaintiff, insuring the plaintiff against loss by reason of the fraud, dishonesty or abstraction of funds of the bank by its officers (in this case, the cashier of the bank).

The bond involved in this action, so far as pertinent here, is in the following words: "The Fidelity and Deposit Company of Maryland as insurer . . . hereby binds itself to pay to the Calistoga National Bank, as employer, such pecuniary loss as the employer shall sustain, of money or other personal property, . . . through the fraud, dishonesty, forgery, theft, embezzlement, wrongful abstraction, misapplication or misappropriation, or any other dishonest or criminal act, or omission of, or by any of the employees listed in the schedule forming a part of this bond."

The complaint alleges that on or about the fifth day of May, 1931, while one Roscoe W. Westover was acting as the duly appointed cashier of the plaintiff, said Westover fraudulently, dishonestly and wrongfully abstracted $5,550 from the funds of the plaintiff's bank and appropriated the same to his own use. The means employed are detailed at considerable length in the complaint and set forth in the

findings, which is alleged to have consisted in wrongful representations as to certain real property tendered as security for a loan in the sum just mentioned.

Upon this appeal it is urged that the findings lack evidentiary support in that there is no showing that the plaintiff suffered any pecuniary loss within the meaning of the bond executed by the defendant. It is also insisted that the plaintiff has suffered no pecuniary loss by reason of any of the acts of the said Roscoe W. Westover while acting as its cashier.

The Calistoga National Bank was capitalized for the sum of $75,000. In the year 1931 its five directors consisted of C. A. Carroll, J. C. Siemsen, Calvin Foote, R. W. Westover and Andrew Rocca. Rocca was the president of the bank and Westover its vice-president and cashier. Early in the year 1931 a bank examiner notified the bank that there was a depreciation of $19,000 in the bond account or reserve or capital structure of the bank, and that it be eradicated. This depreciation consisted in the market value of securities held by the bank in which its funds had been invested. Instead of calling upon the stockholders to take proceedings under section 55 of title 12, U. S. C. A., page 98, the five directors appear to have agreed to voluntarily contribute proportionate amounts in order to cover the depreciation in its securities. Westover's proportion, based upon the number of shares of the capital stock held by him, amounted to the sum of $5,550. Westover did not have the money available. The other directors of the bank agreed that the bank should loan him the sum of money necessary to enable him to make his contribution, Westover giving as security certain real property. The loan was nominally made to a man named S. C. Biddle, a brother-in-law of Westover, and on May 1, 1931, a cashier's check of the bank for the sum of $5,550, evidencing the amount of the loan, was issued to Biddle. Biddle indorsed this check to Westover and Westover returned the cashier's check to the bank and it was credited upon the books of the bank as his voluntary contribution to the bond account. At the time of Westover making his contribution, the other directors likewise contributed a proportionate sum, based upon their ownership of stock in the bank, making up the alleged deficiency of $19,000.

The claim on the part of the plaintiff is that Westover fraudulently misrepresented the extent and character of the real property given as security, and that as a result Westover abstracted $5,550 from the bank, and thereby caused the bank to suffer a pecuniary loss in such sum. Upon discovery of the alleged fraud, the bank demanded payment of the defendant, and upon refusal, this action was instituted.

At the time these transactions were being had, the plaintiff was aware that the real estate proposed to be given by Roscoe W. Westover as security for the loan to be made to him, stood in the name of D. L. Westover, his father. The ranch owned by D. L. Westover consisted of approximately 500 acres situate in Placer County, 433 acres thereof lying on one side of a certain highway, and 80 acres thereof lying upon the opposite side of the same highway. The 80 acres contained all the improvements. There is nothing in the record to which our attention has been called which indicates the exact value of either tract of land.

On the part of the appellant it is contended that Roscoe W. Westover represented that the security to be executed by his father would cover all of the property referred to, whereas in truth and in fact it only covered the 433-acre tract of land. The only finding of the court from which any inference can be drawn as to the value of the land is in these words: "That the said Roscoe W. Westover did not have any examination of the title to said property made until 1932, and never obtained title insurance, or other evidence of a merchantable title thereto."

On the twenty-seventh day of April, 1931, a deed to the 433-acre tract was executed by D. L. Westover and Ida F. Westover, his wife, and delivered to Roscoe W. Westover. On June 9, 1931, Roscoe W. Westover and Kathryn Westover, his wife, executed and delivered to Calistoga National Bank a deed of conveyance to the same property. On or about May 1, 1931, Roscoe W. Westover, as vice-president and cashier of the bank, delivered to S. E. Biddle a cashier's check for $5,550 hereinbefore referred to, and received from S. E. Biddle a promissory note, payable to the bank on demand, in the same sum. Thereafter, and on or about the thirtieth day of November, 1931, the Calistoga National Bank deeded said property to S. E. Biddle. This deed was signed by Roscoe W. Westover as vice-president and cash-

ier, and by Andrew Rocca, as president. Thereupon, S. E. Biddle executed and delivered to the bank a trust deed of the property as security for the payment to the bank of said sum.

The record shows that from the inception of the transactions set forth herein, the bank knew that the transaction was being had for the purpose of enabling Roscoe W. Westover to make a voluntary contribution to the bank in order that its capital structure, to wit, the securities in which its funds had been invested, might be restored and stand unimpaired. The bank also knew of the transaction with Biddle, and that the name of Biddle was used only as a means of enabling Westover to make such contribution. The knowlege of the president of the bank as to the character of the transaction and what was done is shown by the following testimony:

"Q. It was understood at all times by yourself and the other directors of the bank that Mr. Biddle personally was merely lending his name in the transaction? A. It was. Q. You knew that this ranch, this D. L. Westover ranch, was not owned by Roscoe W. Westover at that time, did you not? A. I did. Q. And you knew that it did belong to Mr. D. L. Westover, his father? A. I knew that it had belonged to Mr. D. L. Westover, his father, and I presumed that it still did. Q. In any event, you knew that Roscoe did not own it? A. That is very true. Q. And that before he could give your bank any security in the form of a deed or a deed of trust, or a mortgage covering the ranch, he would have to get it from his father, did you not? A. That was quite evident. Q. Now, did you see this deed when it came back to the bank? . . . A. I did. Q. Now, what was the next thing done with reference to the matter, as far as you know? A. After the loan was accepted by the Board? Q. Yes, sir. A. Mr. Westover was authorized to conclude the loan in the usual manner. Q. What do you mean by that? What was said? A. He was told to complete the loan in the usual manner, that is, the giving of that property as security for the loan. Q. And thereafter do you know if Mr. Westover took a note from S. E. Biddle? A. He did. Q. And these deeds, plaintiff's exhibits 4 and 5 were obtained by the bank? A. Yes, they were. Q. And when that note was executed, this cashier's check, that is

dated May 1st, 1931, payable to the order of S. E. Biddle, was executed, is that correct? A. That is correct. Both of them were executed by R. W. Westover. Q. Just a minute— A. (Interrupting, continuing) or put through. The note was put through and the cashier's check was drawn by Mr. Westover. Q. Was the note executed by Mr. Westover? A. It was put through our books, I shouldn't have used the word 'executed'. Mr. Biddle is the signer of it. Q. But the cashier's check to S. E. Biddle was delivered or was issued anyway, in exchange for this note, is that correct? A. That is. Q. Then the cashier's check was endorsed by S. E. Biddle and then endorsed to R. W. Westover and then what was done with it? A. That is not just the way it was handled. Q. Well, it bears those endorsements? A. Yes, it does. Mr. Westover took the cashier's check and mailed it to S. E. Biddle, who was then in Oakland in a hospital and who furnished his endorsement and returned it to R. W. Westover and then R. W. Westover put his endorsement on it and then put it into his account. Q. Well, what was done with it then? A. The proceeds of it were used for this voluntary contribution to the bond account adjustment. Q. And does this sheet (daily ledger sheet for May 5, 1931) show what was done with the proceeds of the $5550.00? A. It shows it was used to make Westover's payment of $5550.00. Q. To what account? A. To the bond adjustment account. Q. Does the sheet show whether upon the same date any other payment was made by anybody else in the same account? A. It does. Q. What other payment is shown? A. J. C. Siemsen, $1500.00, C. A. Carroll, $1800.00, C. E. Foote, $600.00, A. Rocca, $6750.00, Henry Brown, $3000.00. Q. How much does that total together with Mr. Westover's payment of $5550.00? A. $19,200.00. Q. As I understand it, all of these payments were made upon the same day to make up this total? A. That is correct. Q. It was understood at all 'times by yourself and the directors of the bank that Mr. Biddle personally was merely lending his name in this transaction? A. It was. Q. Yes, that he was not personally going to pay this $5550.00? A. I understood it that way. Q. And these deeds, plaintiff's exhibits 4 and 5, were obtained by the bank? A. Yes, they were. Q. Do you know who attended to the preparation of these various

deeds and deed of trust, that are received in evidence in this case? A. Mr. Westover did, as far as I know. He met his father and obtained the deed from his father, having it prepared elsewhere. Q. But for the bank and it was Mr. Westover that did that? A. Yes, it was. *They were filed by Mr. Westover in the regular bank's file* with an appraisal on the outside by himself.''

This testimony shows conclusively that the president of the bank had knowledge of the execution of all the instruments executed in carrying out the transaction. The only testimony as to any encumbrances on the property given as security for the payment of the loan relates to delinquent taxes in the sum of approximately $700. D. L. Westover testified that the 433 acres in 1931 was assessed for approximately the sum of $10,000; that the land at one time was worth $60 per acre; and that at the present time he fixed its market value at $30 per acre.

As we have stated, the court made no finding as to the value of the property, and outside of what we have referred to, we have found no testimony relating to that subject. While the details of the transaction were left to Roscoe W. Westover, the testimony of the president of the bank shows that the character of the instruments, the form thereof, and the purpose were all well known, and that if any liability was incurred by anyone to the bank, it was a liability on the part of Roscoe W. Westover, and that so far as S. E. Biddle was concerned, his name was simply used as a convenient instrument with the knowledge of the president of the bank, and without any consideration passing from Biddle to the bank.

Passing the question as to the value of the property and the mere allegation that the title thereto was not insured nor shown to be merchantable, the crucial question is as to whether the bank suffered any pecuniary loss by reason of the transactions which we have detailed within the meaning of the bond executed and delivered to it by the defendant. Irrespective of whether the moneys contributed by the directors to make up the deficiency in the bond account be called voluntary contribution, donation or gift, the fact remains that the moneys contributed by all of the directors amounted to nothing more than a gift. Neither Westover nor any of the other directors could have been

compelled to make up the deficiency in the capital structure of the bank caused by the depreciation in the market value of the securities held by it. A similar question was before this court in the case of *Dudley* v. *Citizens State Bank*, 103 Cal. App. 433 [284 Pac. 958], where it is said: "Where the directors of a bank, in response to a demand of the bank examiner that they make good an impairment of the capital stock, sign and discount their personal note and deposit the proceeds to the credit of the bank, the transaction is a donation or gift to the bank. (Citing *Interstate Trust etc. Co.* v. *Irwin*, 138 La. 325 [70 So. 313]; *Wright* v. *Gurley*, 133 La. 745 [63 So. 310].)" In that case the question was whether moneys advanced by a president of the bank constituted either a loan or a gift.

That there was a direct or indirect obligation on the part of the bank to make good the deficiency is shown by section 55, 12 U. S. C. A., page 98. That section reads: "Every association which shall have failed to pay up its capital stock as required by law, and every association whose capital stock shall have become impaired by losses or otherwise, shall, within three months after receiving notice thereof from the controller of the currency, pay the deficiency in the capital stock by assessment upon the shareholders in prorata for the amount of the capital stock held by each." This was the obligation placed upon the plaintiff in this case. In the event that the shareholders failed to make good the deficiency by levying an assessment, the section further provides that if any association shall fail to pay up its capital stock or go into liquidation, the controller of the currency shall appoint a receiver to take charge of the affairs of the bank. We do not need to cite the various sections of the law authorizing assessments to be levied upon stockholders to pay the indebtedness in the event that the assets of the bank are insufficient.

The finding of the court to the effect "that on or about the 5th day of March, 1931, the said Roscoe W. Westover fraudulently, dishonestly and wrongfully abstracted $5550.00 from the funds of the plaintiff's bank and appropriated the same to his own use by the following means and devises", is shown by the foregoing not to be supported. No funds of the bank were appropriated to the uses and purposes of Roscoe W. Westover. All the funds remained in the bank.

The transaction simply affected a transfer of the funds of the bank from one account to another. As a legal proposition the funds were not appropriated to the uses and purposes of Roscoe W. Westover. Whatever was done and whatever transfer of funds was made were for the uses and purposes of the bank alone. The money represented by the transaction remained in the possession of the bank at all times. Its funds were not abstracted. Nothing was taken from the possession of the bank. The finding of the court is that the money was abstracted. There is no finding that the bank suffered any pecuniary loss, for the simple reason that the testimony shows the bank suffered no pecuniary loss. The obligation of the bond executed by the defendant, as we have set forth herein, distinctly binds the Insurance Company to make good only such pecuniary loss as the bank might suffer. However irregular the transaction had with Westover may have been, unless the bank suffered a pecuniary loss, and had some of its funds or property taken away from its possession, no cause of action arose, or could arise against the defendant. The bond binds the defendant to make good pecuniary losses. It does not covenant that all the transactions had by the various officers of the bank with the bank shall be regular or strictly in accordance with law. The bank was in exactly the same position, so far as the value of its funds were concerned, after, as before the transactions had with Roscoe W. Westover. If it ever realizes by reason of the trust deed covering the 433 acres, the bank will be just that much ahead. In other words, it will have gained instead of suffered a loss. That the security may not be equal in value as understood by other directors of the bank, affects only the question of how much the bank may gain by reason of its possession of the trust deed. A somewhat similar question was before the Supreme Court of Iowa in the case of *Birrell* v. *Fidelity & Casualty Co. of New York*, 193 Iowa, 860 [188 N. W. 26, 30]. In considering the question of what constitutes wrongful abstraction and loss the court said: ''It is not to be overlooked that the creditors of the corporation had a right to payment from the assets of the corporation. The appellant could not, by a system of bookkeeping, separate its old accounts from its new accounts, and divide its so-called 'old assets' from its 'new assets', in any manner to change the

status of outstanding creditors of the corporation. Nor could it 'lose' by the payment of its valid obligations, whether the same were due to 'old' creditors or to 'new' creditors. At the threshold of the case, we think appellant has failed to establish that it has suffered a 'loss' within the meaning of the contract of indemnity, by the appropriation of its assets to the payments of its *bona fide* debts. Was there a 'wrongful abstraction' of appellant's assets? As before stated, we are not called upon to determine in this case any question of the individual liability of Birrell to appellant for failure on his part to perform the terms and conditions of his contract, unless such failure caused a loss to appellant by reason of the 'wrongful abstraction' of appellant's assets. The contract or bond of the fidelity company did not cover every liability or claim that may exist between the appellant and Birrell. (*Sinclair* v. *National Surety Co.*, 132 Iowa, 549 [107 N. W. 184]; *Monongahela Coal Co.* v. *Fidelity & Deposit Co.*, 94 Fed. 732 [36 C. C. A. 444]; *Milwaukee Theatre Co.* v. *Fidelity & Casualty Co.*, 92 Wis. 412 [66 N. W. 360]; *Kansas Flour Mills Co.* v. *American Surety Co.*, 98 Kan. 618 [158 Pac. 1118].) . . . It only insured the appellant against 'loss' by the 'wrongful abstractions' of Birrell. Did the use of appellant's assets to pay appellant's debts constitute a 'wrongful abstraction'? We think not within the meaning of the contract of insurance. Birrell's obligations to the appellant have in no manner been changed. If he agreed to pay certain debts of the appellant, and has not paid them, he is still liable therefor to the appellant. But the fidelity company did not assume any liability whatever for the payment of these debts by Birrell. It did not undertake to indemnify appellant against the payment of its debts, with its own funds. It cannot well be said that the payment of appellant's obligations, with its own assets, constituted a 'wrongful abstraction' of said assets within the meaning of the contract of the fidelity company."

The obligation, either direct or indirect, as we have stated, of the plaintiff, was to make good the deficiency in its bond account, and the transfer of its funds from its commercial account to the bond account did not constitute an abstraction of its funds or occasion any loss.

■ Irrespective of the entries upon the books of the plaintiff, the facts of the case must be looked to to determine the liability if any, of the defendant. (*Turlock Irr. Dist.* v. *Edwards*, 205 Cal. 320 [270 Pac. 936]; *Anaheim Union Water Dist.* v. *Parker*, 101 Cal. 483 [35 Pac. 1048].) Thus, while the books show the issuance of a cashier's check to S. E. Biddle, the facts disclose that it was only a means of transferring the funds of the bank from what we have called the commercial account, or ordinary assets, to the bond account. There was no depletion of its funds at any time, as shown by the facts.

That a surety is not liable unless there has been an actual loss, is the holding in the following cases: *First Nat. Bank* v. *National Surety Co.*, 130 Fed. 401 [66 L. R. A. 777]; *Hudson* v. *United States*, 55 Fed. (2d) 591. In all the cases which have been called to our attention, and which we have been able to find, where the surety has been held liable, the facts show an actual loss of funds. Nothing would be added of value by an analysis or review of such cases.

Neither the testimony nor the findings showing any loss of the funds of the plaintiff within the meaning of the surety bond executed and delivered to the plaintiff by the defendant, it follows that the judgment should be reversed, with directions to the trial court to enter judgment in favor of the appellant, and it is so ordered.

Thompson, J., and Pullen, P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on April 13, 1935, and an application by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on May 13, 1935.