[Civ. No. 23802.   Second Dist., Div. Three.   May 23, 1960.]

FLETCHER JONES COMPANY (a Corporation), Respondent, v. UNITED PACIFIC INSURANCE COMPANY (a Corporation), Appellant.

Anderson, McPharlin & Conners and Robert E. Jones for Appellant.

Cantillon & Cantillon and James P. Cantillon for Respondent.

FORD, J.—This is an appeal from a judgment in favor of Fletcher Jones Company, a corporation, in the sum of $4,540.

The appellant, United Pacific Insurance Company, a corporation, issued to respondent a contract entitled "Comprehensive Dishonesty, Disappearance and Destruction Policy." That policy was in effect from June 9, 1953, to January 2,

1956. By the terms thereof the appellant agreed to indemnify the respondent for all loss that might be sustained by the respondent in that period of time through any fraudulent or dishonest act or acts committed by any of the employees of the respondent.

The claim of the respondent, an automobile dealer, arose out of the acts of a manager of its used-car department, one Harold M. Crecy. During the period from January 2, 1955, to October 16, 1955, he sold certain used automobiles belonging to the respondent and collected therefor the sum of $2,040 which he failed to turn over to his employer. On January 3, 1955, Crecy obtained from the respondent a check for $2,500 in which Crecy was named as payee. The check was obtained by him for the ostensible purpose of purchasing a used car for the respondent but Crecy presented the check for payment and converted the proceeds to his own use. The appellant concedes that the evidence is sufficient to support the findings of the trial court with respect to the occurrence of such acts. The amounts of money so obtained by Crecy form the basis of the judgment of the trial court.

The appellant's attack upon the judgment is founded on the claim that, under the evidence, no ultimate loss in excess of $190 was suffered by the respondent. The evidence upon which reliance is placed will now be summarized.

So that the theft of $2,500 might be concealed, Crecy prepared documents indicating that the $2,500 check had been used to purchase a 1954 Buick automobile on January 17, 1955. No such automobile was bought. Upon the expiration of the policy of the appellant, there became effective as of January 2, 1956, a fidelity bond issued by the New Amsterdam Casualty Company in the penal sum of $20,000 whereby that company agreed to indemnify the respondent for any loss it might sustain by reason of the fraudulent or dishonest acts of respondent's employees. Between February 14, 1956, and July 5, 1956, inclusive, Crecy obtained six more checks from the respondent which were for a total amount of $24,650. These checks were respectively made payable to various used-car dealers but the proceeds were obtained by Crecy for his own use. To cover these transactions, Crecy caused false records to be made so as to indicate that such checks had been used to purchase automobiles and that such automobiles were in stock.

One of the checks to which reference has been made bore the date of February 14, 1956, and was in the amount of $3,350. The payee named therein was one Tony Laskill.

Crecy testified that he had Laskill endorse the check and then purchased a cashier's check for $3,050 payable to Laskill. The difference of $300 in amount between the two checks was retained by Crecy. He then had Laskill endorse the cashier's check. Crecy also endorsed that check and thereafter deposited it in his own bank account, drawing out the sum of $250 in cash. His personal check for $2,500 was given to the respondent on or about February 20, 1956, to pay for the fictitious Buick automobile which, according to the falsified records, had been sold to Nugent Motors in June of 1955. It is the position of the appellant that such payment satisfied the defalcation of January 3, 1955, and, accordingly, judgment should not have been given against it for that item.

On July 17, 1956, the sum of $3,500 was paid by Crecy to the respondent. This payment appeared to be for a sale on behalf of the respondent under the date of May 22, 1956, of used cars to a dealer known as Fletcher Motors. Such transaction was fictitious in nature and had been recorded by Crecy in such a manner as to make it appear that automobiles which had been purchased with the check of February 14, 1956, had been sold.

As stated above, the specific defalcations as shown by the evidence were in the sums of $4,540 in 1955 and $24,650 in 1956, or a total of $29,190. The New Amsterdam Casualty Company paid $20,000 to the respondent under its bond. A bank paid to the respondent the sum of $3,000 with respect to a claim against it relating to one of the 1956 checks. These payments and the sums of $2,500 and $3,500 received by the respondent in 1956, as above set forth, resulted in a recovery by the plaintiff of $29,000. Accordingly, the appellant contends that its liability is limited to $190.

We turn first to the contention of the appellant that the sum of $2,500 obtained by Crecy by use of the check of January 3, 1955, was repaid from the proceeds of the check of February 14, 1956, and, therefore, the loss was one occurring at the time the New Amsterdam Casualty Company bond was in effect rather than during the time covered by the policy of the appellant. The difficulty with such position is that the respondent did not receive additional moneys as a result of the February 14, 1956, transaction to any greater extent than would have been the case if the scheme had been carried out by mere bookkeeping entries. (See *Calistoga Nat. Bank* v. *Fidelity & Deposit Co.*, 5 Cal.App.2d 248 [42 P.2d 1051]; cf. *United States Fidelity & Guaranty Co.* v. *Union Bank of*

*Canada* (1917) 39 Ont.L.R. 338, (1917) 36 D.L.R. 724; *Employers' Liability Assur. Corp.* v. *State,* 110 Ind.App. 86, 94 [34 N.E.2d 936, 938-939].) As to such amount of $2,500, there was no actual pecuniary loss to the respondent by virtue of the latter transaction. Hence such a situation is not governed by the reasoning used in cases relating to public officers, such as *People* v. *Hammond,* 109 Cal. 384 [42 P. 36], which hold that where a deficiency for one term has been covered up by money which was received or collected during a subsequent term, the surety upon the bond for the subsequent term is liable for that money so misapplied in the latter term. The same is true with respect to those cases which involve the application by a private agent or employee of new funds coming into his hands to cover prior defalcations. Accordingly, we need not make a choice between the cases which adopt the view that when new funds coming into the hands of an agent or employee are used for the purpose of making good prior defalcations, there is a conversion under the fidelity bond currently in existence (*Citizens' Savings, Loan & Building Assn.* v. *Weaver,* 127 Ill.App. 252, 257; *American Bonding & Trust Co.* v. *Milwaukee Harvester Co.,* 91 Md. 733 [48 A. 72]; *White & Bollard* v. *Standard Acc. Ins. Co.,* 175 Wash. 174 [27 P.2d 123]; cf. *Aetna Casualty & Surety Co.* v. *Board of Supervisors,* 160 Va. 11, 63 [168 S.E. 617, 633]), and the cases which express the view that the misappropriation of funds after the date of the fidelity bond, with which to pay prior shortages, does not constitute a new pecuniary loss under such bond. (*Golden Seal Assurance Soc.* v. *Aetna Cas. & Surety Co.,* 207 App.Div. 628 [202 N.Y.S. 674]; *Royal Indem. Co.* v. *American Vitrified Products Co.,* 117 Ohio St. 278 [158 N.E. 827, 62 A.L.R. 407]; see *Employers' Liability Assur. Corp.* v. *State, supra,* 110 Ind.App. 86, 90 [34 N.E.2d 936, 937].) It is clear, therefore, that the $2,500 defalcation of January 3, 1955, remained unpaid unless covered, in whole or in part, by the payments made to the respondent by the New Amsterdam Casualty Company and by the bank. That matter will be next considered.

█ It is, of course, true that the appellant could be liable to the respondent only to the extent that the respondent suffered an actual pecuniary loss as a result of Crecy's acts in 1955. (See *Calistoga Nat. Bank* v. *Fidelity & Deposit Co., supra,* 5 Cal.App.2d 248, 258.) It is the contention of the appellant that there was no such loss in excess of $190 because of the moneys paid back by Crecy and because of the payments by the New Amsterdam Casualty Company and the

bank. Setting to one side any consideration of the right of the New Amsterdam Casualty Company to recover back the amount, if any, paid by it as to a defalcation not covered by its fidelity bond (see *United States Fidelity & Guaranty Co.* v. *Union Bank of Canada, supra,* (1917) 39 Ont.L.R. 338, (1917) 36 D.L.R. 724), we will summarize certain evidence upon which the appellant relies in support of its contention. Mr. Levy, an accountant who made an examination of the financial books and records of the respondent, testified that the only specific losses after January 2, 1956, which he found were in the total amount of $24,650. The report of the accountants employed by the respondent which was submitted to the appellant and to the New Amsterdam Casualty Company showed such specific losses. A letter dated December 12, 1956, written by the attorney for the respondent to the attorney for the New Amsterdam Casualty Company contained the statement that the bank had indicated that "they will pay up to the total amount of the check dated April 26, 1956, issued to Val Culwell in the amount of $3,600.00; however, *only to the extent that such sums are necessary to make Fletcher Jones whole after payment by your client of the $20,000.*" (Emphasis added.) In a letter from the attorney for the respondent to the attorney for the bank under the date of December 12, 1956, it is stated that the payment of $20,000 by the New Amsterdam Casualty Company would not "make Fletcher Jones whole" and therefore demand was being made upon the bank for the sum of $3,000.[1] In a letter to the appellant dated October 10, 1956, the attorney for the respondent stated that "for the past two months we have been engaged in some rather extensive investigation in connection therewith, *and have uncovered thefts of approximately $24,000.00.*" (Emphasis added.)

However, the record contains other evidence tending to show that the payment of the amount of its bond by the New Amsterdam Casualty Company was made for the purpose of settling whatever claims the respondent might have against it and was not calculated solely by reference to specific defalcations. James P. Cantillon, the attorney for the re-

---

[1]That letter contains a paragraph as follows: "Since our total losses are in excess of $23,000, we will be compelled to litigate the remaining amount with the United Pacific Insurance Co. Our claim against the Bank is in no wise effected by the policy with United Pacific for the reason that this policy was in effect only for the calendar year 1955 and relates to claims against Mr. Crecy and others for dishonest acts occurring in that year."

spondent, testified at length with respect to his negotiations with Mr. Poore, the attorney for the New Amsterdam Casualty Company. He told Mr. Poore in their first discussion that, based upon his information, he believed that the respondent had suffered a loss of many thousands of dollars. In a subsequent discussion, Mr. Cantillon said that his information was that the respondent had lost "at least a couple of hundred thousand dollars" as a result of the defalcations of Crecy which occurred over a period of time.[2] He further stated that he had determined that the respondent would not proceed by litigation against the bank but that he might be able to negotiate a settlement by way of compromise on one of the checks. He then testified that at that point in the conversation, Mr. Poore stated that the matter would be entirely between the bank and the respondent and the appellant and "that he had concluded in behalf of New Amsterdam to throw in the $20,000 penal sum." In response to a question as to what ultimate agreement was reached between him and Mr. Poore, Mr. Cantillon testified: "In effect, the agreement was this: that New Amsterdam would pay $20,000, that Mr. Poore directed me to file a Proof of Loss, and he directed the form in which the Proof of Loss was to be prepared.

"I then sent the Proof of Loss along to him, and Mr. Poore completely understood it. I was at the same time attempting to get as much money as I could from the Bank of America on two of the checks in question that they had honored, which were forged over one signature, also with the understanding that I was attempting at the same time to recover from United Pacific our claim against them in the sum of $2,500

---

[2] On cross-examination, Mr. Cantillon testified as follows: "Q. You also testified that you told Mr. Poore that based upon your information that you believed at that time that Fletcher Jones Company had a loss of many thousands of dollars? A. Yes sir. Q. What was your information in late August or early September that led you to that belief? A. I was informed that Mr. Crecy, when purchasing automobiles in Texas had received moneys under the table on each transaction, which moneys should properly have belonged to the Fletcher Jones Company. I was also informed that Mr. Crecy had sold, as is set forth in the report, some $120,000 worth of automobiles wholesale, actual wholesale fair market value worth of automobiles to Val Culwell for some $95,000 in 1955, that he had continued in this practice throughout the year 1956. I was informed that Mr. Crecy and Miss Cook, who I believe testified here, were frequently at the race track together, that Lee Wissler and Mr. Crecy were frequently at the race track together during working hours, betting large sums of money. I was informed that it was generally known throughout the automobile business that they had been obtaining money through the guise of appraising these automobiles low. In other words, take a $2,000 automobile and trade it in."

plus $2,040 or a total of $4,540."[3] Inasmuch as the appellant was a stranger to the agreement reached by the respondent and the New Amsterdam Casualty Company, the respondent was at liberty to show the full or true character of the transaction with the New Amsterdam Casualty Company irrespective of the contents of the written proof of loss submitted to the latter company. (*Mayfield* v. *Fidelity & Casualty Co.*, 16 Cal.App.2d 611, 619 [61 P.2d 83].) That there was a basis for Mr. Cantillon's claim of a loss over and above the specific items noted in the accountants' report is shown by the testimony of Mr. Levy. With respect to the total amount of the defalcations, he testified: "I think we have never been able to determine what the total amount was. . . . The nature of it was such that all we could do was spell out the ones we were pretty certain about, and the nature of his position being the manner in which he could buy and sell used cars and the side deals that would be made with some of these wholesalers, you couldn't tell what the total amount was." Moreover, it would not seem to be probable that the New Amsterdam Casualty Company, possessed as it was of the details and dates of specific defalcations as set forth in the accountants' report, would base its payment in part upon any defalcation occurring prior to the effective date of its bond, January 2, 1956.[4]

It was the function of the trier of fact to weigh the evidence bearing upon the issue of whether there had been reimburse-

---

[3]Mr. Poore, on cross-examination by counsel for respondent, testified as follows: "Q. Do you remember a conference at which United Pacific Insurance Company was present, you were present, Mr. Conners, rather, their representative, the attorney, in which you stated in effect, well, there is no point in my being here because we are going to throw in our $20,000; so it is up to you fellows to thrash this out? A. No. I don't remember saying that specifically. Q. Or words to that effect? A. But that was the way that I felt. . . . Q. Do you remember making that statement in effect, that you were going to put your $20,000 in, that further, you didn't see any reason why you were there particularly, that we would have to thrash out our position with United Pacific Insurance Company? A. Well, I don't remember making that remark about United Pacific Insurance Company, but I do remember that you and I had reached the point where it was clear that the limits of our policy had been reached and that we were going to pay that much. I believe that we had reached that point before the discussion."

[4]In a letter dated January 21, 1957, from Mr. Poore, attorney for the New Amsterdam Casualty Company, to Mr. Cantillon, attorney for the respondent, Mr. Poore stated: "There is another item which apparently will not be covered by the New Amsterdam Casualty Company. This check No. 20464 issued on January 3, 1955 to Harold Crecy for a fictitious Buick and the money was subsequently replaced on June 30, 1955, with some of the money from the July 5, 1956, $6000 check. This item will be covered by the former carrier and we feel that they

ment, in whole or in part, of the respondent for the defalcations of 1955. The trial court determined that there had not been such reimbursement. With that conclusion we are not at liberty to interfere. ▮ In reviewing the evidence on this appeal, all conflicts must be resolved in favor of the respondent and all legitimate and reasonable inferences indulged in to uphold the determinations of fact by the trial court if possible. ▮ The power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the trial court. ▮ When different inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court. (*Crawford* v. *Southern Pacific Co.*, 3 Cal.2d 427, 429 [45 P.2d 183].)

▮ The appellant also complains that the court below, over objection, permitted the president of the respondent corporation to testify on direct examination as to whether he believed that Crecy's defalcations during the year 1956 exceeded the sum of $20,000. He was further permitted to express his opinion that Crecy was "stealing about $4,000 a month" for a period of "probably three years." While there is merit in the contentions of the appellant insofar as the witness was permitted to express his opinion as to the losses suffered as a result of acts of Crecy (*cf. Miller* v. *Lerdo Land Co.*, 52 Cal. App. 662, 692 [199 P. 1073]), in the light of the other evidence in the record it cannot be said that any ruling of the trial court as to that matter was of such a nature as to constitute prejudicial error.

The judgment is affirmed.

Shinn, P. J., and Vallée, J., concurred.

should pay that amount." Mr. Poore's reference to the July 5, 1956, check appears to have been in error. The reference should have been to the check of February 14, 1956. But, in any event, it is clear that Mr. Poore was aware of the problem of whether the fictitious Buick transaction was covered by the contract of the appellant or that of Mr. Poore's client.